HAMPTON DEVELOPMENT CORPORATION, demandante y apelante, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, demandado y apelado.

*Número:* AC-93-39 *Resuelto:* 18 de enero de 1996

878

*José B. Díaz Asencio*, de *Díaz Asencio, López & Orsini*, abogado de la parte apelante; *Pedro A. Delgado Hernández, Procurador General*, y *María Adaljisa Dávila, Procuradora General Auxiliar*, abogados de la parte apelada.

La Juez Asociada Señora Naveira de Rodón emitió la opinión del Tribunal.

Una vez más, nos confrontamos con una reglamentación temporera que, al impedir todo uso económico productivo, privó al dueño de una propiedad de una porción sustancial de ésta: diez punto dieciséis (10.16) cuerdas de un total de diecisiete punto dieciséis (17.16) cuerdas, es decir, el cincuenta y nueve punto veintiún por ciento (59.21%) del predio.

Debemos determinar si tras haber sido liberada la propiedad de las restricciones impuestas, procede la compen-

sación por el valor del uso de dicha porción durante el tiempo en que el propietario estuvo privado de todo su uso económico productivo.([1])

I

En 1968 Hampton Development Corp. (en adelante Hampton) obtuvo un derecho de opción sobre una propiedad de diecisiete punto dieciséis (17.16) cuerdas en el Barrio Las Cuevas en Trujillo Alto. En esa época la propiedad estaba siendo utilizada para la extracción de tierra. Hampton interesaba dedicarla al desarrollo de un proyecto de viviendas a bajo costo, subsidiado con fondos federales. A esos fines, sometió una consulta de ubicación a la Junta de Planificación (en adelante la Junta) para un proyecto residencial multifamiliar, con un total de seiscientas ochenta (680) unidades de vivienda.

Mediante Resolución de 12 de marzo de 1970, la Junta denegó la consulta al concluir que la finca estaba afectada por el futuro Expreso Ruta Núm. 66. Poco después, Hampton sometió a la Junta una segunda consulta de ubicación, en la cual redujo a cuatrocientos (400) el número de unidades residenciales en el complejo multifamiliar de ocho (8) edificios. Mediante Resolución de 8 de diciembre de 1970, la Junta denegó esta segunda consulta por carecer "de un acceso permanente adecuado para servir al proyecto".

Según determinó el tribunal, Hampton confió en poder

---

([1]) Por no estar ante nuestra consideración la situación de hechos que produjo las determinaciones de derecho en *Pamel Corp. v. E.L.A.*, 124 D.P.R. 853 (1989), no entraremos a discutir lo allí resuelto.

Para una crítica de nuestra jurisprudencia en esta área del Derecho, véanse: W. González Oliver, *Perestroika en la reglamentación inmobiliaria puertorriqueña*, 1 Rev. Acad. Pur. Jur. y Leg. 49 (1989); A. Escudero Viera, *Contestación al Discurso del Licenciado Wallace González Oliver*, 1 Rev. Acad. Pur. Jur. y Leg. 71 (1989); J.J. Álvarez, *Congelaciones de terrenos y la cláusula de justa compensación: El cántaro regresa a la fuente*, en *Derecho Constitucional*, 61 Rev. Jur. U.P.R. 637, 742 (1992).

sobreponer las objeciones, por lo que solicitó la reconsideración de la decisión de la Junta y comenzó a gestionar la adquisición de la propiedad.

Para mayo de 1971, el entonces Gobernador de Puerto Rico aprobó el Plano Regulador del Área Metropolitana de San Juan, el cual, según enmendado, regiría el proceso de planificación, uso de terrenos y trazado de vías para la región metropolitana durante la década siguiente. Entre esas vías, en la parte correspondiente al Plan de Uso de Terrenos y Transportación y el Mapa Oficial de Carreteras, estaba el Expreso Ruta Núm. 66. El trazado de esta ruta afectaba varias propiedades, incluyendo una porción de la finca de Hampton. Determinó el foro de instancia que en la segunda consulta de ubicación se había tomado en consideración el Expreso Ruta Núm. 66, por lo que aparentaba que el proyecto no presentaba un conflicto con éste.

El 26 de octubre de 1971, Hampton adquirió la referida propiedad de diecisiete punto dieciséis (17.16) cuerdas. El precio de la compraventa fue de diez dólares con veinticinco centavos ($10.25) por metro cuadrado, para un total de seiscientos noventa y un mil trescientos dieciséis dólares con veintisiete centavos ($691,316.27).

El 3 de febrero de 1972, la Junta, en reconsideración, emitió una consulta de ubicación favorable al desarrollo del proyecto de Hampton. El proyecto consistiría de un complejo de seis (6) edificios y cuatrocientas once (411) unidades de viviendas. La resolución condicionó la aprobación de la consulta a varios requisitos.([2])

Hampton comenzó a realizar los preparativos para el proyecto. Preparó los planos preliminares; realizó movimientos extensos de tierras para restaurar la topografía de la propiedad e incurrió en otros trabajos de naturaleza ad-

---

([2]) Estos requisitos eran: obtener los endosos de la Autoridad de Carreteras y del Departamento de Obras Públicas; adquirir la franja de terreno necesaria para el acceso, y someter a la consideración de la Junta de Planificación (en adelante la Junta) la aprobación del desarrollo preliminar en sí en un término de seis (6) meses, so pena de que la consulta fuese archivada.

ministrativa relacionados con el proyecto. *Todos estos trabajos se realizaron sin someter el desarrollo preliminar requerido por la Junta.* El 10 de agosto de 1972 la Junta le concedió una prórroga de cuatro (4) meses a Hampton para que sometiera el desarrollo preliminar a su consideración.

Para septiembre de 1972 Hampton fue informado por los oficiales de la Autoridad de Carreteras que la alineación del Expreso Ruta Núm. 66 había sido alterada para incluir una estación de peaje, ampliándose de este modo la servidumbre necesaria. Esto tornaba el proyecto de Hampton en uno *no* viable. Por ello, Hampton optó por abandonar sus planes de desarrollo del terreno e intentó expeditar la adquisición por el Gobierno de la porción de su propiedad afectada, diez punto dieciséis (10.16) cuerdas.[3]

Mediante una comunicación de 22 de septiembre de 1972 al Secretario de Obras Públicas, Hampton informó que la variación en la alineación del Expreso Ruta Núm. 66 eliminó su proyecto definitivamente y le causó daños sustanciales, dejando a la compañía en estado gravoso. El 29 de septiembre de 1972, en respuesta, el Departamento de Obras Públicas le prometió a Hampton que se investigaría el asunto y que se sometería al entonces existente Comité de Casos Gravosos de la Junta y de Obras Públicas.

El 12 de diciembre de 1972, el Subsecretario del Departamento de Obras Públicas le notificó a Hampton que por recomendación del Comité de Casos Gravosos se había aprobado la adquisición de la propiedad y que se había dado instrucciones para iniciar los trámites de mensura.

Hampton, amparándose en lo antes señalado, abandonó los trámites relacionados a su proyecto. No sometió el desarrollo preliminar requerido por la Junta, por lo que su solicitud fue archivada. Tampoco adquirió la parcela de acceso para el proyecto.

---

[3] Hampton tampoco intentó obtener un permiso de variación, según permitía la ley vigente en ese momento. Véase la Ley Núm. 213 de 12 de mayo de 1942 (23 L.P.R.A. sec. 1 *et seq.*).

Durante seis (6) años, de 1973 a 1979, Hampton estuvo activamente gestionando la expropiación. Recibió varias comunicaciones del Departamento de Obras Públicas en que se reiteraba que se estaba en proceso de adquirir la propiedad y que se estaba en una etapa avanzada de adquisición. En 1977, cinco (5) años después de haberse aprobado la adquisición de la propiedad como caso gravoso, se le informó a Hampton que se esperaba terminar la adquisición en un futuro cercano. En dicha comunicación, el Departamento de Obras Públicas adujo que por limitaciones de fondos no se habían podido terminar las transacciones.

Debido a la crisis económica de mediados de la década de los setenta, al Estado no le fue posible asignar los fondos necesarios para la compra. El Estado *nunca* adquirió la propiedad.

Finalmente, el 3 de mayo de 1979, Hampton presentó una acción de expropiación a la inversa. El 25 de junio de 1981 obtuvo una sentencia parcial a su favor, mediante la cual se ordenó la liberación de la propiedad de cualquier restricción impuesta por la Junta.[4] Mediante una Resolución de 19 de agosto de 1981, la Junta liberó la propiedad de las restricciones impuestas.[5]

---

[4] El tribunal ordenó al Estado que dentro del plazo de sesenta (60) días procediera a adquirir la porción de diez punto dieciséis (10.16) cuerdas de la parcela que estaba afectada por el Expreso Ruta Núm. 66 o que procediera a descongelarla.

[5] Posterior a esto, Hampton sometió una consulta de ubicación para un proyecto residencial multifamiliar para envejecientes que sería construido en seis punto ciento veintisiete (6.127) cuerdas de su propiedad. La Junta aprobó la consulta. Hampton sometió una segunda consulta de ubicación en 1982. En esa ocasión el proyecto sería residencial multifamiliar de quince (15) edificios con facilidades para ochenta y dos (82) apartamentos que habían de ser construidos en la porción restante de diez (10) cuerdas de su propiedad. Esta consulta fue denegada mediante la Resolución de 24 de junio de 1982 por tener el proyecto una densidad mayor a la permitida para una propiedad en una zona R-1. Además de esto, se consideró que los accesos existentes y los propuestos eran deficientes. Una reconsideración de Hampton fue denegada el 15 de septiembre de 1982.

Por la determinación de la Junta, antes explicada, Hampton desistió del proyecto de desarrollo de su propiedad. En 1988 vendió el terreno por un total de novecientos cuarenta y cuatro mil doscientos treinta y seis dólares con ochenta y seis centavos ($944,236.86), a catorce dólares ($14) el metro. Según lo determinó el tri-

En la Sentencia parcial de 25 de junio de 1981, el tribunal determinó que los nueve (9) años que la propiedad estuvo congelada era un término irrazonable, por lo que declaró con lugar la demanda. Dejó pendiente para ulterior consideración la reclamación de daños.

Finalmente, después de haber transcurrido trece (13) años de su presentación y de haber intervenido tres (3) jueces, el 15 de octubre de 1992 el tribunal dictó la sentencia que dispuso del caso.[6] En ésta se concedieron sesenta y tres mil trescientos cincuenta y cuatro dólares ($63,354), más los intereses al 6% desde el 1ro de septiembre de 1980, por concepto de los daños sufridos por la parte demandante por el valor de la pérdida del uso de su propiedad.

Concluyó el tribunal que el Estado podía congelar una parte sustancial de la propiedad de Hampton sin tener que compensarla por un período de ocho (8) años, o sea, desde septiembre de 1972 a septiembre de 1980. Impuso daños por el período en exceso de los ocho (8) años por entender que fue desde ese momento que la congelación constituyó una incautación de una parte sustancial de la propiedad de Hampton.

El tribunal concluyó que, según las normas establecidas por nuestra jurisprudencia, Hampton fue privada de "todo uso económico" de su propiedad. Razonó, sin embargo, que según una aplicación estricta de las normas federales, por

---

bunal de instancia, la ganancia de Hampton con la venta fue de doscientos cincuenta y dos mil novecientos veinte con cincuenta y nueve centavos ($252,920.59).

[6] El 29 de julio de 1982, el tribunal dictó una sentencia en la cual desestimó las reclamaciones pendientes, al concluir que la parte demandante no había cumplido con el requisito de notificación al Estado (32 L.P.R.A. sec. 3077a). Ante una oportuna moción de reconsideración de la parte demandante, el 28 de agosto de 1982 el tribunal dejó sin efecto la sentencia.

El Hon. Juez Ángel D. Ramírez se inhibió de continuar participando en el caso al percatarse de su participación como abogado en uno de los incidentes procesales. Referido el caso a otro juez, luego de varios incidentes procesales, el 23 de junio de 1983 quedó aparentemente sometida la procedencia de la reclamación de gastos y daños.

Seis (6) años más tarde, el 18 de abril de 1989, la parte demandante solicitó el señalamiento de la vista en su fondo. Los codemandados se opusieron y plantearon que el caso debía desestimarse por inactividad.

no haber sido privada Hampton de la utilización económica de *todo* uso de *toda* su propiedad, probablemente no tendría derecho a recobrar suma alguna.

Por otro lado, el tribunal no concedió otras partidas de gastos reclamadas por Hampton, tales como, los gastos de movimiento de tierras y de preparación de planos. Entre otros fundamentos, señaló que Hampton incumplió con el requisito de notificación de estas reclamaciones al Estado.

Inconforme con la determinación del foro de instancia, Hampton presentó un escrito de apelación el 8 de febrero de 1993.([7]) Como cuestión constitucional sustancial, reclamó, en síntesis, la violación a su derecho a una justa compensación por la incautación de su propiedad por el Estado desde diciembre de 1972, fecha cuando el Subsecretario del Departamento de Obras Públicas le notificó a Hampton que se había aprobado, como caso gravoso, la adquisición de la porción de la propiedad afectada por el Expreso Ruta Núm. 66, diez punto dieciséis (10.16) cuerdas.

En resumen, los planteamientos incoados por el apelante señalan:

1) que las actuaciones del Estado con respecto a la propiedad del apelante se efectuaron bajo el poder de dominio eminente y constituyeron una incautación desde diciembre de 1972.

2) que la clasificación como caso gravoso constituyó un reconocimiento por el Estado de que el apelante sufrió daños económicos y que la actuación del Estado fue irrazonable y confiscatoria, constituyendo una incautación de la propiedad sin el pago de una justa compensación.

3) que la incautación comenzó en diciembre de 1972 y duró hasta agosto de 1981.

(4) que la aplicación por analogía al caso de autos del período de ocho (8) años estatuido en la Ley Núm. 2 de 29 de enero de 1979, constituye una aplicación retroactiva de la ley.

(5) que la tasa del 6% de interés que el tribunal de instancia

---

([7]) El 8 de marzo de 1993, acudió en revisión la parte demandada, el Estado. En apoyo a su solicitud señaló, en síntesis, que la reglamentación impuesta a la propiedad de Hampton no privó a éste de *todo uso económico de su propiedad*, criterio indispensable que *debió utilizar el tribunal para determinar si procedía o no el pago de daños.* Mediante una Resolución de 2 de abril de 1993, denegamos el recurso.

ordena se pague sobre la cantidad concedida es contraria a la justa compensación y por tanto inconstitucional.

6) que el apelante tiene derecho a las siguientes compensaciones:

(d.1) $1,495.608.00 por concepto de la inversión en el movimiento de tierra preliminar de su propiedad.

(d.2) $1,037.833.00 por concepto de la inversión en planos y gestiones administrativas.

(d.2) $1,437,547.00 por concepto de la privación de todo uso económico de la propiedad.

Acogimos la apelación presentada por plantear una cuestión constitucional sustancial. Con el beneficio de los alegatos presentados por ambas partes, procedemos a resolver la controversia.

## II

En síntesis, en sus primeros tres (3) señalamientos de error el apelante plantea que las actuaciones del Estado en la controversia que nos ocupa se efectuaron bajo el poder de dominio eminente y que la incautación de su propiedad comenzó en diciembre de 1972, fecha cuando se le notificó que su caso era gravoso y que el Estado estaba haciendo gestiones para adquirir la parte de la propiedad afectada por el proyectado Expreso Ruta Núm. 66. Esta situación duró hasta agosto de 1981, cuando finalmente, por orden del tribunal, se liberó la propiedad de las restricciones impuestas. Reclama, por lo tanto, el pago de los daños sufridos por concepto de la privación del uso económico productivo de su propiedad como consecuencia de dicha actuación gubernamental, desde diciembre de 1972 hasta agosto de 1981.

El Art. II, Sec. 7 de la Carta de Derechos de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, consagra el derecho fundamental del ser humano al disfrute de la propiedad. El Art. II, Sec. 9 establece, además, que:

No se tomará o perjudicará la propiedad privada para uso

público a no ser mediante el pago de una justa compensación y de acuerdo con la forma provista por ley ....

■ Similar protección al derecho de propiedad se encuentra en la Constitución de Estados Unidos. Establece la Quinta Enmienda de dicha Constitución que nadie será privado de su vida, libertad o propiedad sin el debido proceso de ley, ni se tomará la propiedad privada para uso público sin una compensación justa. *Heftler International, Inc. v. J. de P.*, 99 D.P.R. 467, 473–474 (1970).

■ A tono con dicho mandato constitucional, se ha reconocido que el Estado tiene la obligación de pagar una justa compensación cuando se incauta de una propiedad mediante el ejercicio directo del poder de dominio eminente, instando un recurso de expropiación o por medio de su reglamentación, o cuando ocurre una invasión física de ésta. *Velázquez Velázquez v. E.L.A.*, 135 D.P.R. 84 (1994); *Culebra Enterprises Corp. v. E.L.A.*, 127 D.P.R. 943 (1991); *Sucn. García v. Aut. de Carreteras*, 114 D.P.R. 676 (1983); *Olivero v. Autoridad de Carreteras*, 107 D.P.R. 301 (1978).

■ Para los casos excepcionales de ocupación física, incautación de un derecho real, o *restricciones a la propiedad por vía de reglamentación sin haberse presentado una acción de expropiación*, se ha instituido la acción de expropiación a la inversa. La acción es denominada así porque se insta por el dueño de la propiedad contra el Estado para obtener la compensación a que tiene derecho, y generalmente le aplican las mismas normas y principios que rigen la acción de expropiación iniciada por el Estado. Véanse: *Velázquez Veláquez v. E.L.A.*, supra, pág. 88; *E.L.A. v. Northwestern Const. Inc.*, 103 D.P.R. 377, 383 (1975); *Olivero v. Autoridad de Carreteras*, supra, pág. 307.

■ De otra parte, se ha reconocido que en los casos de incautación reglamentaria no existe una fórmula que demarque la separación entre el poder de razón del Estado y el de expropiación. Resulta particularmente apropiada la

ya clásica cita del Juez Holmes en *Pennsylvania Coal v. Mahon*, 260 U.S. 393, 415 (1922), de que "aunque la propiedad pueda ser reglamentada hasta cierto grado, si la reglamentación excede los límites ésta se reconocerá como una incautación". (Traducción nuestra.) En consecuencia, nunca se ha precisado el momento cuando la reglamentación alcanza tal magnitud que el poder de razón del Estado se convierte en el de expropiación forzosa. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992); *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340 (1986); *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978); Epstein, *Takings: Descent and Resurrection*, Sup. Ct. Rev. 1 (1987). Tanto en Estados Unidos como en Puerto Rico, esta determinación se hace caso a caso, sopesando los distintos valores involucrados para obtener un equilibrio dinámico y razonable entre los intereses particulares y los de la comunidad. *Arenas Procesadas, Inc. v. E.L.A.*, 132 D.P.R. 593 (1993); *The Richards Group v. Junta de Planificación*, 108 D.P.R. 23, 29 (1978); *Flamboyán Gardens v. Junta de Planificación*, 103 D.P.R. 884, 891 (1975); *Yee v. City of Escondido*, 503 U.S. 519 (1992).

Según expresó el Juez Brennan en su disidencia en *San Diego Gas & Electric Co. v. San Diego*, 450 U.S. 621, 653 (1981), citado con aprobación por el Juez Scalia en *Lucas v. So. Carolina Coastal Council*, supra, pág. 814:

> Los reglamentos del poder de razón del Estado tales y como las ordenanzas de zonificación y otras restricciones al desarrollo de terrenos, pueden destruir el uso y disfrute de la propiedad para promover el bien público tan efectivamente como una expropiación formal o una invasión física de la propiedad. Desde el punto de vista del propietario, poco importa si su terreno se le expropió o inundó o se le restringió por reglamento el uso de estado natural, si el efecto en ambos casos es privarle de todo el uso y disfrute.

> El hecho de que una incautación reglamentaria sea tempo-rera, por razón del poder gubernamental para rescindir o en-

mendar reglamentación, no la hace menos incautación en el sentido constitucional. (Traducción nuestra.)

█ Para lograr el justo balance de intereses en casos de reglamentos bajo el poder de razón del Estado que pueden afectar los derechos propietarios, se toman en consideración los factores siguientes: "(1) la naturaleza de la actuación gubernamental; (2) el impacto económico de la reglamentación sobre las personas o entidades afectadas, y (3) si el impacto económico sobre el individuo es menor que el interés protegido por la reglamentación." *Arenas Procesadas, Inc. v. E.L.A.*, supra, pág. 604; 2 *Treatise on Constitutional Law: Substance and Procedure* Sec. 15.12(e) (1992); F.I. Michelman, *Property, Utility, and Fairness: Comments on Ethical Foundations of "Just Compensation" Law*, 80 (Núm. 6) Harv. L. Rev. 1165 (1967).

█ *Se ha requerido una justa compensación cuando la reglamentación priva al dueño de todo uso productivo de su propiedad. Agins v. Tiburon*, 447 U.S. 255 (1980); *Arenas Procesadas, Inc. v. E.L.A.*, supra, pág. 607; *Culebra Enterprise Corp. v. E.L.A.*, supra, pág. 953. Ello es así porque la privación total del uso económico de una propiedad equivale a una invasión física por parte del Estado. Aunque el efecto de la privación sea temporero, se ha reconocido que procede una compensación por el valor del uso de la propiedad durante el tiempo en que el Estado privó al dueño de todo uso productivo de ésta. La posterior liberación de las restricciones impuestas no exime al Estado del deber de compensar. Véanse: *Lucas v. South Carolina Coastal Council*, supra, pág. 815; *First Lutheran Church v. Los Angeles County*, 482 U.S. 304 (1987); *Arenas Procesadas, Inc. v. E.L.A.*, supra. El Tribunal Supremo federal, por voz de su Juez Presidente Rehnquist, específicamente expresó en *First Lutheran Church v. Los Angeles County*, supra, pág. 321, lo siguiente:

... Una vez que un tribunal determina que ha ocurrido una

incautación, el gobierno retiene toda la gama de opciones disponibles —enmendar la reglamentación, retirar la reglamentación invalidada, o ejercer su poder de dominio eminente. Por lo tanto, y contrario a lo que sugiere el Procurador General, nosotros no "permit [imos] que un tribunal, a instancias de un particular, le requiera al Gobierno que ejerza su poder de dominio eminente ...." Comparecencia de Estados Unidos como *Amicus Curiae*, 22. *Simplemente sostenemos que en aquellos casos en que, mediante acción gubernamental, ya se haya efectuado una incautación de todo uso de una propiedad, ninguna acción posterior del gobierno puede relevarlo de la obligación de proveer compensación por el tiempo que duró dicha incautación.* (Traducción y énfasis suplidos.)(8)

 Cabe señalar, sin embargo, que en los casos de propiedades afectadas por zonificación, no se activa el derecho a compensación simplemente porque la reglamentación impide el uso óptimo o más productivo de éstas. Tampoco procede per se una compensación cuando la reglamentación sólo tiene el efecto de disminuir el valor de la propiedad. Por último, debemos indicar que la denegación de un permiso solicitado por un propietario no constituye una incautación si éste no queda impedido de dedicar

---

(8) En *First Lutheran Church v. Los Angeles County*, 258 Cal.Rptr. 893 (1989), al ser devuelto el caso a la Corte de Apelaciones de California, ésta resolvió que: (1) la ordenanza que impedía la construcción de cualquier edificación en el área de protección contra inundaciones era temporera y no negaba todo uso de la propiedad, y substancialmente adelantaba el interés del Estado en la seguridad de impedir daño o muerte en la próxima inundación, y (2) que la ordenanza interina no constituyó una incautación temporera interina aun asumiendo que las restricciones eran demasiado abarcadoras si hubiesen sido impuestas permanentemente, ya que la ordenanza sólo imponía una moratoria temporera por un tiempo razonable mientras se conducía un estudio y se determinaba qué usos eran compatibles con la seguridad pública.

Como cuestión de hecho y de derecho, y en cuanto a si la ordenanza negaba todo uso productivo a la propiedad, el tribunal determinó que no se negaba todo uso productivo de la propiedad, ya que ésta sólo prohibía la reconstrucción de las estructuras dañadas en la inundación y la edificación de nuevas estructuras; no prohibía el uso de cualquier estructura que hubiese subsistido a la inundación. Además, no prohibía el uso de la propiedad como sitio para acampar (*campground*) y después de todo Lutherglen era precisamente una facilidad para acampar (*camping facility*).

Para una crítica de esta decisión, véase a M.E. Gabor, *Iruerse Condemnation a Temporary Flood Control Ordinance Held Not to be a Compensable Fifth Amendment Taking Contrary to Supreme Court Mandates: A Right Result For The Wrong Reasons?*, 39 Drake L. Rev. 945 (1990).

la propiedad a otro uso razonable. *Arenas Procesadas, Inc. v. E.L.A.*, supra, y casos allí citados.

En *First Lutheran Church v. Los Angeles County*, supra, el Juez Rehnquist, haciendo alusión a las razones tradicionalmente esbozadas por los Estados para apoyar la posición de que en los casos de incautación reglamentaria no debía proceder el remedio de compensación monetaria, reconoció que el fallo en *First Lutheran Church v. Los Angeles County*, supra, indudablemente disminuiría en alguna forma la libertad y flexibilidad de los planificadores, las agencias gubernamentales y las corporaciones municipales sobre el uso de terrenos. Hizo hincapié en el hecho de que estas consecuencias fluyen necesariamente de cualquier decisión que sostenga el reclamo a un derecho constitucional. Expresó que muchas de las disposiciones constitucionales han sido diseñadas, precisamente, para limitar la flexibilidad y libertad de las autoridades gubernamentales. Específicamente, indicó que la Cláusula de Justa Compensación es una de éstas.

En 1992, en *Lucas v. South Carolina Coastal Council*, supra, por voz del Juez Scalia, el Tribunal Supremo de Estados Unidos se pronunció nuevamente sobre la procedencia de una compensación dimanante de una incautación reglamentaria temporera. Allí reconoció que había por lo menos dos (2) categorías de actuaciones regulatorias que eran compensables per se, sin que se tuviese que realizar un análisis específico sobre el interés público que apoya la restricción. Primero, cuando como resultado de la reglamentación, el Estado o una tercera persona invade física y permanentemente una propiedad, aunque sea una invasión *de minimus*. La segunda situación surge cuando una reglamentación despoja al propietario de todo uso económicamente productivo o beneficioso de su propiedad inmueble. *Lucas v. South Carolina Coastal Council*, supra, págs. 812–813; *Arenas Procesadas, Inc. v. E.L.A.*, supra.

En lo que respecta a la segunda situación, cuando la reglamentación del Estado priva al dueño de todo uso económico beneficioso de su propiedad, el Estado sólo puede dejar de compensar cuando el uso prohibido de la propiedad no fue parte del título que éste adquirió. *Lucas v. South Carolina Coastal Council*, supra, pág. 820. Sobre la reglamentación del tipo confiscatorio, expresó que cualquier limitación tan severa no puede ser recién legislada sin compensación; sólo se puede sostener sin compensación cuando es inherente al título, como parte de los principios de las leyes de derecho propietario o de estorbo público (*nuisance*) ya vigentes. Íd., pág. 821.

### III

Pasemos ahora a considerar la legislación sobre reserva, congelación y afectación de propiedades inmuebles.

El 29 de enero de 1979 se aprobó la Ley Núm. 2 (32 L.P.R.A. sec. 2921 *et seq.*). Mediante esta ley se fijó en ocho (8) años el término máximo durante el cual el Estado podía reservar o congelar una propiedad inmueble privada para fines públicos. En su Exposición de Motivos se expresó que se estaba adoptando "una regla uniforme, consistente e indiscriminatoria, mediante la cual se salvaguarde el derecho constitucional del libre disfrute a la propiedad y se garantice un balance adecuado a las partes en lo que respecta a los intereses de cada cual". 1979 Leyes de Puerto Rico 5, 6–7. Pasado este término, que comenzaba a partir de la declaración de reserva para uso público, el dueño de la propiedad afectada podía solicitar a la agencia con jurisdicción que procediera a adquirir la propiedad dentro de un plazo de noventa (90) días. Si la agencia no adquiría la propiedad dentro de ese término, el dueño entonces podía requerirle a la Junta que eliminase la restricción y la Junta procedería inmediatamente a realizar lo solicitado.

En el Art. 3 de la ley, 32 L.P.R.A. ant. sec. 2922, se dis-

puso en específico que en aquellos casos de propiedades reservadas con anterioridad a la vigencia de la ley, el período de ocho (8) años comenzaría a contar a partir de su aprobación, es decir, a partir de 29 de enero de 1979.

La Ley Núm. 2, *supra*, fue sustituida por la Ley Núm. 46 de 26 de junio de 1987 (32 L.P.R.A. secs. 2923–2927). En ninguna de las dos (2) leyes se dispuso específicamente que la adquisición de la propiedad o la eliminación de la restricción serían los únicos remedios disponibles para el dueño de la propiedad afectada. Nada se dijo tampoco sobre el derecho del dueño a ser compensado por el tiempo en que la propiedad permaneciese afectada por la reserva o congelación, cuando dentro de dicho término hubiese ocurrido una incautación. La única discusión sobre este particular surgió entre los Senadores Deynes Soto y Ramos Barroso durante los debates que precedieron a la aprobación de la Ley Núm. 2, *supra*:

SR. DEYNES SOTO: Señor Presidente, no es objeción, pero lo que quisiera saber es, antes de votar esta enmienda, si el compañero dentro de las otras enmiendas considera o va a considerar el que el propietario reciba alguna remuneración del Gobierno o no.

SR. RAMOS BARROSO: Señor Presidente, en la actualidad existe una ley, la cual entró en vigor en el 1954, si no recuerdo mal, a los efectos de que la propiedad que fuese reservada o congelada por el Estado, a esa ley se le eximía del pago de contribuciones. Hasta el 1954 se podía reservar o congelar propiedad privada y el dueño tenía que seguir pagando las contribuciones de esa propiedad. En el 1954 se entendió por la Legislatura de que esa era una disposición demasiado onerosa para el dueño de los terrenos y se le dio entonces, mediante legislación la facultad de no pagar contribuciones sobre la propiedad inmueble.

Entendemos, señor Presidente, de que esa ley es suficientemente amplia para darle al contribuyente, al darle al dueño de la propiedad, una exención a pesar de que no está usando la propiedad por estar congelada como desearía el dueño. Creemos que el no pagar contribuciones sobre la propiedad es suficiente incentivo o suficiente ayuda al dueño de la propiedad para que el Estado tenga esa propiedad congelada. No creemos que el Estado deba hacer alguna contribución adicional, ya que

si la propiedad se reserva o se congela para propósitos de bienestar público, no creemos que sea necesario darle ninguna concesión adicional al dueño del terreno que no sea el no pago de contribuciones durante el tiempo que está la propiedad reservada o congelada.

SR. DEYNES SOTO: Señor Presidente, entonces, debo entender que se va a continuar con la exención contributiva de los terrenos a los propietarios de los mismos mientras está identificada o congelada para uso o fines públicos.

SR. RAMOS BARROSO: Sí, señor Presidente. *El único efecto de este Proyecto es que el Estado no puede congelar o reservar propiedades por un término mayor de ocho años.* (Énfasis suplido.) Debate del Senado sobre el P. del S. 419 de 27 de marzo de 1978, págs. 10–11.

A pesar de esta discusión, no se incluyó disposición alguna en la ley que limitase el remedio del dueño a lo allí establecido o que descartase el pago de una justa compensación por el valor del uso del terreno, cuando la congelación, reserva o afectación resultase en una incautación al privar al dueño de todo su uso económico productivo.

En cuanto a la Ley Núm. 46, *supra*, en el Art. 1 (32 L.P.R.A. sec. 2923), simplemente se expresó que se hacía necesario adoptar estas normas "sobre la asignación de costos y beneficios, especialmente aquéllas relativas a los criterios y términos utilizados para determinar cuándo los costos al propietario trascienden los beneficios a la sociedad".

De otra parte, en el Art. 3 de la Ley Núm. 46, *supra*, 32 L.P.R.A. sec. 2925, se estableció, como uno de los criterios para determinar la afectación de terrenos, la denegación de todo uso productivo en un área mayor de veinte por ciento (20%) del predio de un terreno, tomando en consideración la cabida total del predio original. Con relación a esta ley, en *Culebra Enterprises Corp. v. E.L.A.*, supra, pág. 955, expresamos que al fijar el término de ocho (8) años se persigue que el Estado cuente "con tiempo suficiente para llevar a cabo cualesquiera estudios necesarios antes de decidir el destino de la propiedad, sin limitar *ad perpetuam* e irrazonablemente los derechos del dueño afectado. Sin em-

bargo, ello no significa que el Estado viene obligado a mantener la restricción por los ocho (8) años. Puede liberar la propiedad antes". En este mismo caso reconocimos, citando a *First Lutheran Church v. Los Angeles County*, supra, "que cuando la reglamentación conlleva privar al dueño de todo uso efectivo de su propiedad, no basta simplemente con invalidar esa reglamentación. Bajo la Quinta Enmienda el remedio constitucional que procede es el pago de una compensación monetaria por el período que duró la reglamentación". (Énfasis suprimido.) Íd., pág. 953.

■ De todo lo antes expuesto se puede colegir que ni la ley vigente al presentarse la demanda en este caso, la Ley Núm. 2, *supra*, ni la ley actual, la Ley Núm. 46, *supra*, contienen disposición alguna que prohíba la concesión de daños por el valor del uso de una propiedad cuando, durante el término de ocho (8) años y al amparo de estas leyes, se reserva, congela o afecta una propiedad, de forma tal que se impide todo uso productivo de ésta y se da lugar a una incautación. Si existe o no una incautación dentro de ese período de ocho (8) años hay que analizarlo caso a caso.

IV

Pasemos ahora a aplicar las normas de derecho antes expuestas a los hechos específicos del caso ante nuestra consideración.

Según surge de la sentencia, Hampton solicitó y obtuvo la aprobación de una consulta de ubicación para un desarrollo multifamiliar residencial de cuatrocientas once (411) unidades en una porción de diez punto dieciséis (10.16) cuerdas de su propiedad. Resolución de la Junta de Planificación de 3 de febrero de 1972. Al variarse la alineación del Expreso Ruta Núm. 66 en el Mapa de Carreteras en septiembre de ese año, el proyecto quedó afectado por el trazado de dicha vía. Ello implicaba que Hampton estaba

impedida de obtener un permiso de construcción sobre la propiedad.

La anterior situación trastocó todos los planes de desarrollo de Hampton y privó de todo uso económico productivo del predio de diez punto dieciséis (10.16) cuerdas. Esto fue reconocido por el Gobierno, al declararse el caso como gravoso el 12 de diciembre de 1972. Esta declaración conllevaba el compromiso de las agencias responsables de adquirir la propiedad que es objeto de la reserva o congelación de forma prioritaria. A pesar de que por espacio de siete (7) años, en respuesta a innumerables gestiones de Hampton, el Gobierno estuvo afirmándole que el proceso de adquisición estaba a punto de culminar, éste nunca llegó a realizarse por falta de los fondos necesarios. Ante esta situación, Hampton se vio precisado a presentar una acción de expropiación a la inversa, esto es, la liberación de la propiedad de las restricciones y daños.

El tribunal de instancia determinó que las restricciones impuestas por el Estado a la propiedad del demandante *conllevaban la privación sustancial de todo uso económicamente productivo de la propiedad, por lo que le asistía al apelante el derecho a recobrar daños por dicha privación.* Concluyó, además, que la compensación requerida por la cláusula de justa compensación, conforme a *First Lutheran Church v. Los Angeles County,* supra, era aquella conmensurable al valor del uso de la propiedad *durante el período que duró la incautación.* Resolvió que la incautación comenzó pasados los ocho (8) años de haber sido congelados los terrenos, aplicando así los conceptos de la Ley Núm. 2, *supra.* De esta forma, intentó armonizar lo que entendió que era el precedente federal con la disposición estatutaria que interpretó como que permite que los terrenos privados en Puerto Rico puedan ser reservados por un máximo de ocho (8) años sin que el Estado esté obligado a proveer compensación alguna por el valor del uso de éstos durante ese período. Expresó que el precedente establecido en *First*

*Lutheran Church v. Los Angeles County*, supra, posiblemente invalidaría la Ley Núm. 2, *supra*. Sin embargo, no lo aplicó por entender que dicho precedente exige que se prive al propietario de *todo uso de toda la propiedad*, y que en este caso el apelante no había sido privado del uso de *toda* su propiedad. Arguyó que las restricciones que eran objeto de esta controversia sólo aplicaban a un predio de diez punto dieciséis (10.16) cuerdas, el cincuenta y nueve punto veintiún por ciento (59.21%) de la cabida total de diecisiete punto dieciséis (17.16) cuerdas. Apoyó su decisión, además, en lo resuelto en *Penn Central Transp. Co. v. New York City*, supra. No le asiste la razón.

Un análisis de la Ley Núm. 2, *supra*, y de las normas de derecho antes expuestas nos lleva a concluir que la interpretación del tribunal de instancia no encuentra apoyo en éstas. En *First Lutheran Church v. Los Angeles County*, supra, el gobierno del Condado de Los Ángeles adoptó una ordenanza interina que prohibía la construcción en una zona que temporeramente se había clasificado como inundable. La iglesia demandante alegó que dicha ordenanza le privaba de su propiedad sin justa compensación. *El Tribunal Supremo determinó que una reglamentación de carácter temporero que efectivamente priva* al dueño de todo uso y disfrute de su propiedad constituye una incautación compensable, aunque luego el Estado retire las restricciones impuestas.([9])

En el caso de autos no cabe la menor duda de que a Hampton se le privó de todo uso económico productivo de una parte sustancial de su propiedad, diez punto dieciséis (10.16) cuerdas, o sea, el cincuenta y nueve punto veintiún por ciento (59.21%) de la totalidad del predio. El propio Estado así lo reconoció. Es esta propiedad, las diez punto dieciséis (10.16) cuerdas, la que fue incautada por la regla-

---

([9]) El Tribunal devolvió el caso al foro de California para que éste determinase si bajo los hechos específicos que encontrase probados, la Iglesia había sido privada de todo uso y disfrute de la propiedad. Véase esc. 8.

mentación del Estado y la que el tribunal de instancia ordenó que se expropiase o se le eliminasen las restricciones impuestas y se compensasen los daños por la privación de su uso.

■■ En *First Lutheran Church v. Los Angeles County*, supra, el Tribunal hace referencia, en todo momento, que se le haya privado al dueño de *todo uso* de su propiedad, no a todo uso de *toda su propiedad*. En la incautación reglamentaria al igual que en la física y en la expropiación propiamente, el Gobierno sólo expropia o se incauta y, por ende, compensa la parte de la propiedad que necesita o que ha incautado. En cuanto al remanente de la propiedad, el Estado sólo está obligado a compensar cuando éste sufre daños sustanciales como consecuencia de la expropiación o incautación. *Pueblo v. García*, 66 D.P.R. 504 (1946). Además, véanse: *E.L.A. v. Fonalledas Córdova*, 84 D.P.R. 573 (1962); *E.L.A. v. Bravo*, 79 D.P.R. 779 (1956); *Pueblo v. Anadón*, 69 D.P.R. 822 (1949).

El caso *Penn Central Transp. Co. v. New York City*, supra, tampoco brinda apoyo a la tesis del foro de instancia. Allí se sostuvo la constitucionalidad de una ley del estado de Nueva York sobre la preservación de edificios históricos que regulaba la utilización del espacio aéreo sobre la Terminal "Grand Central". El estatuto no prohibía expresamente toda construcción sobre el espacio aéreo; sólo la reglamentaba de acuerdo con los propósitos de conservación histórica de la ley. En este caso se le permitió al propietario seguir utilizando el edificio y obtener beneficios económicos de la propiedad. Además, tuvo la opción de solicitar otro permiso para el uso del espacio aéreo que fuese cónsono con los propósitos de la ley. Finalmente el tribunal concluyó que, como los apelantes no habían solicitado la aprobación para una estructura más pequeña, no se podía determinar que se les había negado todo uso de cualquier porción del espacio aéreo del terminal.

Recientemente, en 1992, en *Lucas v. South Carolina*

*Coastal Countil*, supra, el Tribunal Supremo federal equiparó la reglamentación temporera que despoja a un propietario de todo uso de su propiedad a una invasión física. El Juez Scalia expresó que cuando al dueño de una propiedad inmueble se le requiere que sacrifique todo uso económicamente beneficioso de una propiedad en nombre del bien común, esto es, se le exige que deje su propiedad inerte, este propietario ha sufrido una incautación. Íd., pág. 815. Esto fue precisamente lo que ocurrió con las diez punto dieciséis (10.16) cuerdas de Hampton. El hecho de que Hampton poseyese siete (7) cuerdas más y que éstas estuviesen agrupadas con las diez punto dieciséis (10.16) cuerdas incautadas, no convierte la incautación de estas últimas en una no compensable. Indiscutiblemente, Hampton fue privado de todo uso económico productivo de las diez punto dieciséis (10.16) cuerdas de su propiedad.

En el caso de autos, la alteración en la alineación del Expreso Ruta Núm. 66 impedía al apelante todo posible uso del cincuenta y nueve punto veintiún por ciento (59.21%) de su propiedad, la cual estaría exclusivamente destinada a la construcción del Expreso Ruta Núm. 66. Esto no es una incautación de una porción *de minimus* de la propiedad de Hampton. Si por analogía aplicamos los criterios establecidos en la Ley Núm. 46, *supra*, encontramos que la porción del predio que el legislador estimó que constituía una denegación de todo uso productivo de una propiedad y, por ende, una afectación, era una mucho menor, el veinte por ciento (20%) del predio, tomando en consideración la cabida total. 32 L.P.R.A. sec. 2925(b).

De otra parte, el término que dure la reserva en unión a los criterios antes esbozados es un factor adicional que se ha de considerar para determinar si la reglamentación impuesta constituyó una incautación del terreno afectado. En el caso de Hampton encontramos que el término de duración de las restricciones también fue irrazonable. A partir de 1972 y tras el reconocimiento expreso por las agencias

concernidas de que se trataba de un caso gravoso, de una incautación, y que sería necesario expropiar el predio afectado, transcurrieron nueve (9) años sin que el Estado hiciera buena su promesa de expropiar. Durante todo este tiempo mantuvo a Hampton esperanzado en que llevaría a cabo la expropiación. Resulta claro que este período transcurrido es mucho más que el razonablemente necesario para que las agencias gubernamentales pudiesen efectuar los trámites necesarios encaminados a lograr la expropiación del predio afectado.

En resumen, tomando en consideración los hechos de este caso y las normas de derecho antes expuestas, concluimos lo siguiente: (1) que a éstos les aplica la Ley Núm. 2, *supra*, antecesora de la actual Ley Núm. 46, *supra*; (2) que la citada Ley Núm. 2 no dispone que el único remedio para situaciones en que haya habido una incautación reglamentaria será el allí establecido de expropiación o liberación de la restricción al cabo de ocho (8) años; (3) que dicha ley no impide, si se dan los criterios establecidos en la jurisprudencia, el que pueda haber una incautación durante el término de ocho (8) años que le permite al Estado reservar o congelar un terreno;([10]) (4) que la reglamentación del Estado privó a Hampton, por espacio de casi nueve (9) años, de todo uso económicamente productivo de una parte sus-

---

([10]) Recordemos que en *Flamboyán Gardens v. Junta de Planificación*, 103 D.P.R. 884 (1975), establecimos seis (6) criterios para determinar cuándo una congelación de terrenos se convierte en una incautación. Señalamos que al determinar la razonabilidad del tiempo transcurrido deben tomarse en cuenta los siguientes factores:

"... a) la naturaleza de la mejora pública que requiere la paralización del uso de terrenos, b) prioridad de la misma en el programa de mejoras públicas, c) costo del terreno y recursos disponibles, d) magnitud del perjuicio al dueño del terreno; si se trata de un proyecto de urbanización ... debe considerarse el valor de los terrenos congelados en relación con el desarrollo total aprobado, e) la posibilidad de otros usos productivos del terreno que no hagan más oneroso el desarrollo de la futura mejora pública; y, por supuesto, f) extensión del término transcurrido." *Flamboyán Gardens v. Junta de Planificación*, supra, págs. 891–892.

Adviértase que conforme a lo allí expresado el término de duración de la congelación de los terrenos es sólo uno de los factores que se han de considerar. A la luz de dichos criterios, no podemos presumir irrebatiblemente la validez de una congelación cuya duración sea menor de ocho (8) años.

tancial de su propiedad, el cincuenta y nueve punto vein-
tiún por ciento (59.21%) de ésta; (5) que esto constituye
una incautación reglamentaria temporera y así fue recono-
cido por el Estado al determinar que se estaba ante un caso
gravoso y que procedía el que se expropiara, y (6) que in-
dependientemente de que la restricción fue eliminada, pro-
cede que el Estado compense a Hampton por el valor del
uso efectivo del predio de diez punto dieciséis (10.16) cuer-
das que fue objeto de las restricciones impuestas como
parte de la proyectada construcción del Expreso Ruta
Núm. 66, según aparecía en el Plan de Uso de Terrenos y
Transportación y el Mapa Oficial de Carreteras. Hubo una
incautación reglamentaria de la propiedad de Hampton,
por lo menos desde diciembre de 1972, cuando el Comité de
Casos Gravosos del Departamento de Obras Públicas de-
terminó que existía un caso gravoso, y a partir de esa fecha
es que se debe computar la compensación.

## IV

Pasemos ahora a considerar la alegación del apelante de
que el tribunal de instancia erró al denegarle el derecho a
compensación por los gastos en que incurrió en planos y
gestiones administrativas relacionadas a su proyecto resi-
dencial de cuatrocientas once (411) unidades. Solicita las
sumas de trescientos cuarenta y cinco mil quinientos se-
tenta y dos dólares ($345,572) y doscientos cuarenta mil
dólares ($240,000) por estos gastos, respectivamente. Es su
contención que se incurrió en dichos gastos basándose el
apelante en la aprobación de su consulta de ubicación, por
lo que procede la compensación a la luz de lo resuelto en
*Phi Delta Pi v. Junta de Planificación*, 76 D.P.R. 585
(1954). La discusión de esta alegación no amerita que nos
extendamos al respecto. No le asiste la razón al apelante.

En *Phi Delta Pi v. Junta de Planificación*, supra,
pág. 591, establecimos tres (3) requisitos para la proceden-

cia de daños por este concepto: (1) que se haya expedido un permiso de construcción por un funcionario debidamente autorizado; (2) que la persona que ha obtenido el permiso haya actuado a base de éste, y (3) que haya incurrido en gastos sustanciales.

En el caso de autos, Hampton no llegó a obtener un permiso de construcción. El proyecto fue congelado en una etapa preliminar, no existiendo garantía alguna de que la construcción fuese aprobada. Adviértase que la Resolución de la Junta de 3 de febrero de 1972, que aprobó la consulta de ubicación, disponía expresamente que la acción tomada por la Junta *no implicaba* la aprobación del desarrollo preliminar en sí, el cual debía someterse a su consideración bajo ciertas condiciones. Era, por lo tanto, responsabilidad de Hampton someter el desarrollo preliminar a la Junta dentro del término de seis (6) meses, gestión que nunca fue efectuada. Cabe señalar que, a la fecha cuando se varió la alineación del Expreso Ruta Núm. 66, Hampton sólo había solicitado una prórroga para cumplir con el requisito establecido por la Junta.

◼ El derecho de propiedad no abarca el derecho de urbanizar un predio sin la autorización gubernamental, la cual puede condicionarse. *The Richards Group v. Junta de Planificación*, supra, pág. 35. Concluimos, por lo tanto, que no le asiste al apelante el derecho a ser compensado por concepto de dichos gastos reclamados.

Con relación a la cantidad reclamada en concepto de planos, coincidimos con el foro de instancia en que la confección de éstos era una inversión necesaria para el propio trámite inicial del proyecto, sin que existiese seguridad alguna en esa etapa de que el proyecto había de ser aprobado. Aunque no existe controversia en que la parte demandante incurrió en gastos por los conceptos reclamados, esta inversión no está protegida por ley. El Estado ha de pagar únicamente por lo que expropia o por la pérdida del valor del uso, no por las oportunidades que el dueño

pueda perder como resultado de la expropiación. *Adm. de Terrenos v. Nerashford Dev. Corp.*, 136 D.P.R. 801 (1994). El error no fue cometido.

## V

En la sentencia emitida por el tribunal de instancia el 15 de octubre de 1992, específicamente se dispuso: "se dicta sentencia condenando a las co-demandadas al pago solidario de la suma de $63,350.00 más intereses al tipo de 6% desde el día 1ro de septiembre de 1980", fecha a partir de la cual el tribunal dispuso que comenzó la incautación de la propiedad del apelante. Hampton sostiene que erró el tribunal al ordenar el pago de intereses al tipo de 6%, afirmando que a tenor con la vigente norma federal la tasa del 6% debe ser considerada como un mínimo y no como el máximo del por ciento que se debe fijar.

Recientemente, en *E.L.A. v. Rexco Industries, Inc.*, 137 D.P.R. 683 (1994), nos expresamos en torno al por ciento de interés que debe fijarse como parte de la compensación que ha de otorgarse en los casos de expropiación por el Estado.[11]

 Como parte integral de la justa compensación que debe ser concedida, la Ley de Expropiación Forzosa ordena el pago de "intereses al tipo anual de seis (6) por ciento sobre la cantidad finalmente concedida como valor de la propiedad *a contar desde la fecha de la adquisición*, y desde dicha fecha hasta la fecha del pago". (Énfasis suplido.) 32 L.P.R.A. sec. 2907. Véase *E.L.A. v. Rexco Industries, Inc.*, supra, págs. 686-687.

---

[11] El Juez Asociado Señor Hernández Denton ratifica sus reservas sobre los pronunciamientos en *E.L.A. v. Rexco Industries, Inc.*, 137 D.P.R. 683 (1994). Véase la opinión disidente del Juez Asociado Señor Rebollo López, a la cual se unió. Por considerar que la opinión mayoritaria en dicho caso constituye el precedente aplicable al caso de autos, ha decidido endosar la presente opinión.

Originalmente, la legislación federal sobre expropiación forzosa, *Declaration of Taking Act*, 40 U.S.C. sec. 258(a), contenía un lenguaje similar al de los Arts. 5(a) y 5(b) de nuestra ley, 32 L.P.R.A. secs. 2907 y 2908. Posteriormente, los tribunales federales resolvieron que dicha tasa debía interpretarse como un mínimo. Como resultado, el 27 de septiembre de 1986 el Congreso derogó la tasa del seis por ciento (6%) dispuesta en el *Declaration of Taking Act*. Véase *E.L.A. v. Rexco Industries, Inc.*, supra, pág. 687, y casos allí citados.

■ Como al presente nuestra Asamblea Legislativa no ha modificado el tipo de interés a tono con la nueva norma federal, en *E.L.A. v. Rexco Industries, Inc.*, supra, resolvimos que hasta tanto la Asamblea Legislativa enmiende la ley de acuerdo con estos pronunciamientos, la tasa de seis por ciento (6%) ha de interpretarse conjuntamente con la disposición de carácter general establecida en la Regla 44.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III, y el Reglamento Núm. 78-1 de la Oficina del Comisionado de Instituciones Financieras, sobre sentencias finales y firmes. "Dicho reglamento visualiza los intereses a base de las 'fluctuaciones en el mercado' local, fenómeno dinámico que por experiencia prima facie se apuntala en criterios razonables". (Énfasis suprimido.) *E.L.A. v. Rexco Industries, Inc.*, supra, pág. 690. Se determinó que la decisión emitida y el Reglamento Núm. 78-1 aplicarán a todo caso de expropiación en trámite ante los tribunales y en los cuales no haya recaído una sentencia final y firme.

Aplicando por analogía la decisión anterior al caso que nos ocupa, procede el pago de intereses al tipo fijado por el Comisionado de Instituciones Financieras al momento de dictarse la sentencia desde el 12 de diciembre de 1972,

fecha a partir de la cual concluimos que comenzó la incautación de la propiedad del apelante.([12])

## VI

En atención a los fundamentos antes expuestos, resolvemos que el apelante tiene derecho a la indemnización por los daños sufridos por la privación de todo uso efectivo de su propiedad, desde el 12 de diciembre de 1972 y hasta la fecha de liberación de las restricciones impuestas a la propiedad el 19 de agosto de 1981, más el pago de interés al tipo fijado por el Comisionado de Instituciones Financieras, desde el 12 de diciembre de 1972.

*Se dictará sentencia para revocar la emitida por el tribunal de instancia en todo lo que resulte incompatible con lo expuesto en esta opinión y se devuelve el caso a dicho foro para ulteriores procedimientos consistentes con lo aquí resuelto.*

---

([12]) "OFICINA DEL COMISIONADO DE INSTITUCIONES FINANCIERAS INTERESES SOBRE SENTENCIAS

| FECHAS | GOBIERNO | OTROS |
|---|---|---|
| Hasta julio 5 de 1985 | 6.00 | 6.00 |
| De julio 6 de 1985 a Dic. 31 de 1988 | 12.00 | 12.00 |
| Enero 1989 a junio 1989 | 8.50 | 11.50 |
| Julio 1989 a diciembre 1989 | 8.50 | 12.50 |
| Enero 1990 a junio 1990 | 8.00 | 11.50 |
| Julio 1990 a diciembre 1990 | 7.50 | 11.00 |
| Enero 1991 a junio 1991 | 7.00 | 11.00 |
| Julio 1991 a diciembre 1991 | 5.50 | 9.50 |
| Enero 1992 a junio 1992 | 4.50 | 8.50 |
| Julio 1992 a diciembre 1992 | 4.00 | 7.50 |
| Enero 1993 a junio 1993 | 3.50 | 7.00" |

El Juez Asociado Señor Fuster Berlingeri disintió con una opinión escrita. El Juez Asociado Señor Rebollo López no intervino.

— O —

Opinión disidente emitida por el Juez Asociado Señor Fuster Berlingeri.

El dictamen de la mayoría en el caso de autos presupone que hubo una incautación reglamentaria temporera de la propiedad de Hampton Development Corporation (en adelante Hampton) desde el momento mismo cuando el Estado reconoció que, como producto de la reserva de dicha propiedad para uso público, se sujetó el terreno aludido a una condición gravosa. De ese modo, aplicando la doctrina reseñada en *First Lutheran Church v. Los Angeles County*, 482 U.S. 304 (1987), la mayoría, sin analizar si de hecho Hampton fue privada de todo uso efectivo de la propiedad, concluye que procede la compensación correspondiente por el Estado respecto del predio supuestamente incautado.

Desde *First Lutheran Church v. Los Angeles County*, supra, es claro que toda aquella reglamentación, sea temporera o permanente, que prive al dueño de todo uso efectivo de su propiedad constituye una incautación, que ha de ser compensada monetariamente por el Estado por todo el período que duró dicha privación. Véanse, además: *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992); *Culebra Enterprises Corp. v. E.L.A.*, 127 D.P.R. 943 (1991); *Pamel Corp. v. E.L.A.*, 124 D.P.R. 853 (1989). Pero, para que proceda dicha compensación, es indispensable que exista una privación *total* del uso económico de una propiedad. *Dolan v. City of Tigard*, 512 U.S. 374 (1994); *Agins v. Tiburon*, 447 U.S. 255 (1980); *First Lutheran Church v. Los Angeles County*, supra; *Lucas v. South Carolina Coastal Council*, supra. El hecho de que el dueño de

una propiedad sea privado mediante reglamentación de utilizar su predio de la manera más productiva u óptima posible no significa que, a tenor con *First Lutheran Church v. Los Angeles County*, supra, se produjo una incautación. *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1977); *Goldblatt v. Hempstead*, 369 U.S. 590 (1962); *Arenas Procesadas, Inc. v. E.L.A.*, 132 D.P.R. 593 (1993); *Texaco v. Srio. de Obras Públicas*, 85 D.P.R. 712 (1962). De igual forma, no se configura una incautación sujeta a compensación cuando la reglamentación sólo disminuya el valor de una propiedad. *Arenas Procesadas, Inc. v. E.L.A.*, supra.

A fin de poder alegar una incautación, resulta menester que el propietario pruebe que la reglamentación le impide utilizar o dedicar la propiedad para cualquier otro uso razonable. *United States v. Riverside Bayview Homes*, 474 U.S. 121 (1985). Procede la compensación por razón de la incautación únicamente cuando se demuestre que, a virtud de dicha reglamentación, el dueño no podrá obtener beneficio alguno de la propiedad o que todo su valor ha sido destruido. *Arenas Procesadas, Inc. v. E.L.A.*, supra.

En el caso de autos, a pesar de que la opinión mayoritaria gira en torno a la normativa de *First Lutheran Church v. Los Angeles County*, supra, en ésta no se ha dilucidado aún si, de acuerdo con los usos de zonificación permitidos en el terreno, Hampton podía o no utilizar las diez punto dieciséis (10.16) cuerdas reservadas para algún otro uso razonable que no fuera el de urbanizar. Nótese que, al momento de Hampton opcionar la finca, ésta estaba siendo utilizada para la extracción de tierra. Más aún, los usos de zonificación permitidos en dicha propiedad a la fecha del otorgamiento del contrato de opción, no avalaban el desarrollo de dicho terreno para su urbanización. Todo ello sugiere que la propiedad en cuestión servía para otros usos, distintos a los de urbanizar. Ante la ausencia de factores

que señalen con claridad que en el caso de autos a Hampton se le privó de todo uso productivo de la propiedad, no procedía la imposición de una compensación por una incautación que no ha sido claramente establecida.

Por otro lado, nótese también que Hampton adquirió la propiedad con posterioridad a haber sido notificada por la Junta de Planificación de la clasificación de uso público que afectaba el cincuenta y nueve punto veintiún por ciento (59.21%) del predio. No cabe duda que, en el caso de autos, Hampton decidió correrse el riesgo de comprar una propiedad sin ninguna seguridad de que pudiese ser utilizada para los propósitos que deseaba, a saber, para urbanizarla.

Requerir una compensación en estas circunstancias implicaría inaceptablemente que la mera reserva de los terrenos, aun siendo conocida antes de la adquisición de los mismos, constituye per se una incautación. Evidentemente, dicha implicación tendría un efecto abrumadoramente detrimental sobre la planificación pública de los terrenos en este país, que conculca ominosa e innecesariamente la facultad del Estado para tomar las medidas pertinentes dirigidas a promover el bienestar general. Por todo ello, disiento.