EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Frances I. Torres Marrero<br><br>        Apelante<br><br>                v.<br><br>Hon. María E. Meléndez Altieri,<br>Alcaldesa de Ponce, y Municipio<br>Autónomo de Ponce<br><br>        Apelados | Certiorari<br><br>2017 TSPR 204<br><br>198 ____ |

Número del Caso: AC-2016-106


Fecha: 27 de diciembre de 2017


Región Judicial de Ponce


Abogado de la parte Peticionaria:

        Lcdo. Héctor Méndez Loucil


Abogado de la parte Recurrida:
        Lcdo. Marieli Paradizo Pérez


Materia: Sentencia del Tribunal con Opinión disidente

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Frances I. Torres Marrero

    Apelante

       v.

Hon. María E. Meléndez Altieri, Alcaldesa de Ponce, y Municipio Autónomo de Ponce

    Apelados

AC-2016-0106

SENTENCIA

En San Juan, Puerto Rico, a 27 de diciembre de 2017.

¿Resulta prematura una acción de expropiación forzosa a la inversa presentada *luego* de que ocurre una incautación física y permanente de la propiedad pero *antes* de que transcurra el período de ocho años de reserva de la *Ley de Expropiación Forzosa*? Por los fundamentos a continuación, respondemos que no.

I

A. Trasfondo

El caso ante nuestra consideración tiene su génesis en una serie de deslizamientos de terrenos en la Comunidad Reparto Cerca del Cielo del Barrio Canas de Ponce. La situación se recrudeció en el 2007, cuando varios terrenos, caminos y estructuras del área se agrietaron a causa de los deslizamientos. Esto colocó

en riesgo la seguridad de los residentes del área, a tal punto que el Gobierno de Puerto Rico y el Municipio de Ponce encaminaron medidas de emergencia para desalojar a los residentes del área y expropiar sus residencias. La Sra. Frances I. Torres Marrero (peticionaria), estuvo entre las personas desalojadas de su residencia a raíz de los deslizamientos.[1]

El 26 de octubre de 2007, el Hon. Fernando J. Bonilla Ortiz, entonces Gobernador Interino de Puerto Rico, emitió la Orden Ejecutiva Núm. 2007-43. Mediante esta orden, declaró un estado de emergencia en la Comunidad Reparto Cerca del Cielo y autorizó el desembolso de fondos para realizar un estudio geotécnico de la comunidad, diseñar y construir un acceso alterno a la comunidad, atender a las familias afectadas por los deslizamientos y cubrir los gastos extraordinarios en los que incurriera el Municipio de Ponce al atender la situación. Así también, se le asignaron fondos al Departamento de la Vivienda para cubrir por un año el alquiler de una vivienda para las familias de ingresos bajos o moderados cuyas residencias ubicaran en el área de riesgo.

El 10 de octubre de 2008, la Oficina Estatal para el Manejo de Emergencias declaró en estado de ruina varias propiedades mediante la *Certificación de Recomendación de Desalojo de Residencias en Comunidad Reparto Cerca del*

---

[1] Sentencia del TPI, pág. 4.

*Cielo.* Esta certificación recomendó el desalojo permanente de varias familias ubicadas en áreas que constituían un "potencial peligro a la vida debido a la inestabilidad del terreno y daños a las estructuras".[2] Entre las propiedades en estado de ruina, la certificación incluía la propiedad de la peticionaria.[3]

Posteriormente, el 31 de octubre de 2008, el Hon. Aníbal Acevedo Vilá, entonces Gobernador de Puerto Rico, emitió la Orden Ejecutiva Núm. 2008-56, la cual enmendó la Orden Ejecutiva Núm. 2007-43. Esta a su vez reconoció la continuación de los deslizamientos y la necesidad de establecer medidas de mitigación en la zona para estabilizar el terreno. Por esta razón, la orden asignó fondos para desarrollar las medidas de mitigación, lo cual incluiría "la adquisición del terreno para realizar la mitigación y, a su vez, la expropiación de las propiedades allí comprendidas y la demolición de las mismas".[4] La orden además asignó fondos adicionales para la construcción del acceso alterno que se había ordenado previamente, así como para la instalación de una tubería que reestablecería el servicio de agua en el área.

El 19 de febrero de 2009, el Senado aprobó una Resolución Conjunta para asignar $8.3 millones para el

---

[2] Apéndice, pág. 118 (*Certificación de Desalojo de Residencias*).
[3] En cuanto a la propiedad de la peticionaria, la certificación dispone: "desalojo recomendado como permanente dado a factores geológicos y estructurales". Íd., pág. 119 (*Certificación de Desalojo de Residencias*).
[4] Íd., pág. 113 (*Boletín Administrativo Núm. OE-2008-56).*

desarrollo del plan de mitigación en la Comunidad Reparto Cerca del Cielo, la construcción del nuevo acceso a la comunidad y la expropiación de veinte propiedades que la propia resolución identifica por dirección y nombre del residente.[5] Nuevamente, una de las propiedades incluidas en esa resolución constituye la residencia de la peticionaria, ubicada en la Calle Apóstoles, B-4.[6] No obstante, la medida no se aprobó por la Cámara de Representantes.[7]

El 4 de septiembre de 2009, el Hon. Luis G. Fortuño Burset, entonces Gobernador de Puerto Rico, emitió la Orden Ejecutiva Núm. 2009-27. Entre otras cosas, esta orden autorizó el desembolso de fondos que antes habían sido presupuestados pero no asignados propiamente a las agencias que sufragarían los costos de las medidas establecidas, así como al Municipio de Ponce. En cuanto a este último, la orden le asignó $7.8 millones para "atender las necesidades de la Comunidad mediante medidas de asistencia social que pueden incluir, sin limitación, la adquisición de terrenos para realizar mitigación, la expropiación y demolición de propiedades para salvaguardar la seguridad pública, el diseño y construcción de nuevas vías de acceso a la Comunidad, y apoyo y asistencia a los residentes de la Comunidad".[8]

---

[5] Íd., págs. 139-140 (*R.C. del S. 36, 19 de febrero de 2009*).
[6] Íd., pág. 140.
[7] Sentencia del TPI, pág. 4.
[8] Apéndice, pág. 118 (*Boletín Administrativo Núm. OE-2009-027*).

Durante este tiempo, el Municipio de Ponce adquirió diecinueve propiedades que la certificación de la Oficina Estatal para el Manejo de Emergencias (OEME) recomendó para desalojo permanente.[9] Sin embargo, a pesar de figurar entre las residentes recomendadas para desalojo permanente y hacer múltiples gestiones al respecto, la peticionaria no ha recibido oferta de parte del Municipio para compensarle por su propiedad.

B. Procedimiento judicial

El 9 de septiembre de 2010, la señora Torres Marrero presentó una demanda de expropiación a la inversa contra el Municipio Autónomo de Ponce y su alcaldesa, la Hon. María Meléndez Altieri. La señora Torres Marrero solicitó que se le pagara una justa compensación por la pérdida de su propiedad, tras habérsele desalojado debido a los desplazamientos de terreno. Sostuvo que, al igual que otros residentes, se le debía compensar por el valor de su propiedad, que al momento del desalojo tasaba $302,000. Señaló que el Gobierno había presupuestado fondos a esos efectos y sin embargo el Municipio no le había compensado.

El Municipio contestó la demanda y planteó que la demanda era prematura debido a que el trámite administrativo para la adquisición de la propiedad estaba en proceso. También levantó las defensas de prescripción y enriquecimiento injusto. Luego de algunos trámites

---

[9] Sentencia del TPI, pág. 7.

procesales, el Municipio presentó una Moción de Desestimación en la que alegó que la demanda no exponía una reclamación que justificara la concesión de un remedio. En esencia, negó que de la reclamación de la señora Torres Marrero se desprendiera una incautación que hiciera aplicable la figura da la expropiación a la inversa. Además, negó que las órdenes ejecutivas aprobadas le obligaran a adquirir la propiedad de la demandante, pues a su juicio sus acciones iban dirigidas a evitar riesgos y no a apropiarse del inmueble en cuestión.

La señora Torres Marrero replicó la Moción de Desestimación y a su vez presentó una Moción de Sentencia Sumaria. El Tribunal de Primera Instancia declaró con lugar la solicitud de sentencia sumaria luego de examinar las estipulaciones de las partes en el *Informe sobre Conferencia Preliminar entre Abogados*. Según el foro primario, de las estipulaciones surgía que el Municipio de Ponce había incautado la propiedad de la demandante, por lo que procedía la justa compensación que esta última solicitaba. Para llegar a esta conclusión, se dejó llevar por la certificación de la OEME, las órdenes ejecutivas aprobadas por el Gobernador y las estipulaciones de las partes de que la demandante había sido desalojada de su propiedad desde el 2007 y que su residencia se encontraba entre las que la OEME recomendó para desalojo permanente.

El Municipio de Ponce recurrió al Tribunal de Apelaciones mediante recurso de *certiorari*. Ese foro revocó al foro primario y sostuvo que el caso no era propicio para disposición sumaria, pues ameritaba que se celebrara una vista para dilucidar todas las alegaciones y defensas en un caso complejo que a la vez involucraba cuestiones de interés público.

Devuelto el caso al Tribunal de Primera Instancia, ese foro celebró un juicio, desfiló prueba e incluso llevó a cabo una inspección ocular. Entre las estipulaciones de las partes y sus propios hallazgos fácticos, el foro primario realizó varias determinaciones de hechos resumidas a continuación:

(1) al amparo de una orden ejecutiva, el 7 de noviembre de 2008 el personal del Municipio de Ponce desalojó a la demandante de su propiedad debido a la inestabilidad del terreno de Reparto Cerca del Cielo y los deslizamientos que ocurrieron en el 2007;

(2) la demandante recibió asistencia económica del Municipio de Ponce hasta diciembre de 2012 para el pago de cánones de arrendamiento tras ser desalojada;

(3) varios propietarios recibieron ofertas para ser compensados por un setenta u ochenta por ciento del valor de las propiedades de acuerdo a una opinión de valor que recibió el Municipio de Ponce;

(4) el Municipio de Ponce adquirió varias propiedades inmuebles que la certificación de la OEME declaró en estado de ruina;

(5) la demandante hizo gestiones con el Municipio para que se le pagara por su propiedad;

(6) el Ingeniero Isidro Martínez Gilormini tasó la propiedad por un valor de $302,000 para la fecha del desalojo;

(7) la propiedad de la demandante presenta problemas de accesibilidad debido a que un tubo de ocho pulgadas de diámetro fue colocado en la acera como parte de las obras de mitigación del área, el cual obstruye el acceso a pie a la propiedad e impide el acceso vehicular a la misma;

(8) en el patio frontal de la propiedad ubica un sismógrafo para monitorear los desplazamientos del área;

(9) en un momento dado personal del Municipio de Ponce removió puertas y ventanas de la propiedad;

(10) al momento de la inspección ocular la propiedad lucía vandalizada y abandonada.[10]

Tras estas determinaciones, el Tribunal de Primera Instancia concluyó que se había constituido una incautación física de la propiedad de la demandante luego que se recomendara su desalojo permanente, así como su expropiación y demolición. Tratándose de una incautación física que privaba a la demandante de todo uso de su propiedad, el foro primario determinó que procedía la

---

[10] Véase Sentencia del TA, págs. 3-8; Sentencia del TPI, págs. 5-11.

expropiación a la inversa y el pago de una justa compensación desde la fecha de la incautación, sin necesidad de agotar remedios administrativos ulteriores.

El Municipio de Ponce recurrió al Tribunal de Apelaciones, señalando como errores principales que el foro primario emitiera una sentencia sin jurisdicción y determinara que se había configurado una expropiación a la inversa improcedente. El Tribunal de Apelaciones revocó al foro primario, pues concluyó que la sentencia dictada era prematura debido a que el ordenamiento requiere que transcurran ocho años previo a que se pueda incoar una acción de expropiación a la inversa. Sin embargo, la señora Torres Marrero presentó su acción tan solo dos años después de su desalojo, lo que a juicio de ese foro implicó que su acción no estaba madura al presentarse.

Tras una moción de reconsideración fallida, la señora Torres Marrero recurre ante este Tribunal mediante recurso de apelación. Plantea que el foro apelativo intermedio erró al aplicar el período de ocho años de la Ley de Expropiación Forzosa en un caso como éste, en el que ya ocurrió una incautación de la propiedad en cuestión. Acogimos el recurso como *certiorari* y, con el beneficio de los alegatos de ambas partes, resolvemos.

II

El Estado, en el ejercicio de su poder eminente, tiene la facultad de incautar una propiedad privada siempre que

esa actuación persiga un fin público. Velázquez Velázquez v. ELA, 135 DPR 84, 88 (1994); C. Torres Torres, La Expropiación Forzosa en Puerto Rico: Ley, Jurisprudencia, Estudio y Guía práctica, First Book Publishing of P.R., 2002, págs. 1-2. Sin embargo, tanto la Constitución federal como la Constitución de Puerto Rico exigen que el ejercicio de esa facultad esté acompañado de una justa compensación al propietario perjudicado. Enmdas. V y XIV, Const. EEUU, LPRA, Tomo 1; Art. II, Sec. 9, Const. PR, LPRA, Tomo 1.

La obligación del Estado de compensar a un propietario al incautarle su propiedad puede darse en tres escenarios distintos: (1) cuando se ejerce el poder de dominio eminente al presentar un recurso de expropiación, (2) cuando ocurre una incautación de hecho mediante ocupación física, o (3) cuando se reglamenta el uso de una propiedad. Plaza de Descuentos v. ELA, 178 DPR 777, 781 (2010); Hampton Development Corp. v. ELA, 139 DPR 877, 888 (1996). En el segundo y tercer escenario, dado que el Estado no ha instado un recurso de expropiación por su cuenta, el propietario tiene a su disposición una acción de expropiación a la inversa. Amador Roberts v. ELA et als., 191 DPR 268, 279-280 (2014).

La expropiación a la inversa es "el remedio que tiene el dueño de una propiedad afectada u ocupada físicamente por una entidad del gobierno que no ha iniciado el trámite judicial para adquirir dicha propiedad, y tampoco ha pagado

la justa compensación". Íd. (citando a C. Torres Torres, op. cit., pág. 213). Esta acción garantiza "el cumplimiento del Estado con las disposiciones constitucionales que establecen que nadie será privado de su propiedad sin un debido proceso de ley y sin haber mediado compensación". Íd., pág. 279.

Ahora bien, para que proceda la acción de expropiación a la inversa, el demandante tiene que demostrar que su situación particular configura una incautación física de su propiedad o una restricción impermisible del uso de la misma. Veamos en más detalle la normativa al respecto.

A. Tipos de incautación

La jurisprudencia federal establece un deber categórico de compensar a un propietario que ha sufrido una incautación física de su propiedad. Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 322 (2002); Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1015 (1992); R.D. Rotunda & J.E. Nowak, Treatise on Constitutional Law, Vol. 2, sec. 15.12(e)(i), Thomson Reuters, 2012, pág. 1023. En ese escenario, pierde relevancia el propósito gubernamental perseguido, pues la toma física de la propiedad supone una privación evidente de la propiedad según el alcance de la incautación. Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 434-435 (1982); Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 124 (1978). Una vez el gobierno incauta físicamente

una propiedad o parte de esta, está obligado a pagar la justa compensación que proceda. Kaiser Aetna v. United States, 444 U.S. 164, 180 (1979).

Esta norma responde a que la incautación física de una propiedad se considera la intrusión más seria de los intereses propietarios de una persona. Loretto v. Teleprompter Manhattan CATV Corp., supra, pág. 435. Esto, en vista de que el propietario pierde sus facultades básicas de ocupar su propiedad, beneficiarse de su uso y a la vez excluir a otras personas de su uso y posesión. Íd. De ahí que proceda la compensación por esa incautación o "taking" físico, siempre y cuando no se trate de una acción temporera y no planificada en la que el gobierno incurre durante un momento de emergencia. National Bd. of YMCA v. United States, 395 U.S. 85, 93-94 (1969).

Por otro lado, cuando ocurre una incautación reglamentaria, la determinación de si procede una compensación dependerá de si la reglamentación priva al propietario de todo uso productivo o beneficio de su propiedad. De ser ese el caso, al igual que cuando ocurre una incautación física, generalmente procede la justa compensación. Lucas v. S.C. Coastal Council, supra, pág. 1015; R.D. Rotunda & J.E. Nowak, op. cit. No obstante, si la reglamentación solo priva parcialmente al propietario del uso del bien, la determinación de si procede la justa compensación dependerá del fin perseguido por el gobierno y

su impacto en los intereses propietarios. Penn Cent. Transp. Co. v. New York City, supra, pág. 124.

Ciertamente, esta normativa federal de índole constitucional vincula a Puerto Rico y así ha sido reconocida en nuestra jurisprudencia. Véanse Plaza de Descuentos v. ELA, supra, págs. 794-795; Hampton Development Corp. v. ELA, supra, pág. 892.

B. La Ley de Expropiación Forzosa y el período de ocho años de afectación o reserva

La Ley de Expropiación Forzosa, Ley de 12 de marzo de 1903, según enmendada, regula la facultad gubernamental de expropiar propiedad privada. 32 LPRA sec. 2901 et seq. La misma establece los fines para los cuales el Estado puede ocupar una propiedad privada y el procedimiento a llevar a cabo al hacerlo. De pertinencia al caso ante nuestra consideración, la ley establece un término de ocho años dentro del cual el Estado puede afectar o reservar una propiedad privada para fines públicos sin que necesariamente se active la cláusula constitucional de justa compensación. Hampton Development Corp. v. ELA, supra, págs. 893-896; véase C. Torres Torres, op. cit., pág. 93.

En particular, la referida ley establece lo siguiente:

Se establece un término de ocho (8) años contados a partir de la fecha de **afectación** como el período durante el cual cualesquiera terrenos de propiedad privada pueden estar **afectados** como

consecuencia de estar **reservados** para fines o uso
público.

Este término comenzará a contar desde la fecha en
que se deniegue todo uso productivo de unos
terrenos. 32 LPRA sec. 2926 (énfasis suplido).[11]

Asimismo, la ley continúa disponiendo en su próximo

artículo lo siguiente:

Transcurrido el término establecido en la sec.
2926 de este título, el dueño de la propiedad
afectada podrá solicitar por escrito mediante
correo certificado de la agencia a cargo de la
construcción de la obra pública que dio lugar a
la **reserva** y a la **afectación** de los terrenos, que
adquiera la propiedad dentro de noventa (90) días
siguientes, contados a partir de la fecha del
recibo de la solicitud. Si transcurrido dicho
término la agencia no ha adquirido la propiedad,
el dueño podrá requerir a la agencia cuya acción
afectó los terrenos que libere los mismos de
cualquier prohibición impuesta en virtud de la
afectación.

En caso de que posteriormente el Estado tenga la
necesidad de tomar la propiedad para un fin
público, el Estado la adquirirá mediante
negociación o mediante procedimiento de
expropiación. 32 LPRA sec. 2927 (énfasis
suplido).

En <u>Culebra Entreprises Corp. v. ELA</u>, 127 DPR 943,

955 (1991), explicamos que este término de ocho años le

concede al Estado "tiempo suficiente para llevar a cabo

---

[11] También hemos destacado que este término se estableció con el
propósito de establecer una regla uniforme y consistente que permitiera
balancear los distintos intereses envueltos en procesos de reserva de
propiedades. <u>Aner Investment Corp. v. J.P.</u>, 148 DPR 241, 249-250
(1999).

cualesquiera estudios necesarios antes de decidir el destino de la propiedad, sin limitar *ad perpetuam* e irrazonablemente los derechos del dueño afectado". Véase C. Torres Torres, op. cit., pág. 93. [12] El período aplica en escenarios en los que una propiedad es afectada por reglamentación gubernamental que limita el uso productivo que se le puede dar a la misma debido a que se procura destinarla a un fin público. [13] En ese sentido, es preciso destacar que el lenguaje específico de la ley se refiere a instancias en que una propiedad es *afectada* o *reservada* para fines públicos. [14]

---

[12] Véase Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency, supra, que, bajo propósitos similares, reconoce lo siguiente:

> The interest in facilitating informed decisionmaking by regulatory agencies counsels against adopting a *per se* rule that would impose such severe costs on their deliberations. Otherwise, the financial constraints of compensating property owners during a moratorium may force officials to rush through the planning process or to abandon the practice altogether. To the extent that communities are forced to abandon using moratoria, landowners will have incentives to develop their property quickly before a comprehensive plan can be enacted, thereby fostering inefficient and ill-conceived growth. Íd., pág. 339.

[13] Véase Aner Investment Corp. v. J.P., supra, pág. 250 esc. 5 (indicando que el período de ocho años se refiere al término máximo en el que una propiedad puede estar afectada, según la propia Ley de Expropiación Forzosa define *afectación* y *reserva*); Hampton Development Corp. v. ELA, supra, págs. 893-894 (indicando que el período de ocho años se refiere al término máximo en el que una propiedad puede estar reservada o congelada).

[14] La *Ley de Expropiación Forzosa* define los siguientes conceptos:

> (1) **Afectación.**- Significa **la denegación de todo uso productivo en una propiedad** debido exclusivamente a que por la misma se ha propuesto trazar una vía de transportación pública conforme a un plan de transportación o plan vial adoptado por la Junta de Planificación, o porque los terrenos han sido destinados para uso público en un mapa de zonificación o plan de uso de terreno, o porque la Junta de Planificación ha aprobado el desarrollo de un proyecto público sobre dichos terrenos o propiedad.
> (2) Dedicación.- Significa la transferencia gratuita de terrenos al Estado Libre Asociado de Puerto Rico o a sus organismos o instrumentalidades para uso público pudiendo

Así pues, es menester también aclarar que el período de ocho años dispuesto en esta ley no aplica en aquellas instancias en las que un organismo gubernamental incauta físicamente una propiedad. Esto, en vista de que la *Ley de Expropiación Forzosa* no contempla escenarios de incautación física dentro el articulado que establece el período de ocho años de afectación de terrenos.[15] Más aun, no podría hacerlo pues, por imperativo constitucional, tal incautación de por sí acarrea justa compensación. Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency, supra, pág. 322 ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof. Thus, compensation is mandated […] even though that use is temporary").

No obstante, el período aludido podría aplicar a una reglamentación o restricción de uso temporero (*i.e.*, afectación o reserva), pues la validez de estas

ser como parte de las condiciones para la aprobación de un proyecto.
(3) **Reserva**.- Significa la determinación o actuación de un organismo gubernamental competente mediante la cual **separe terrenos privados para fines públicos**. 32 LPRA sec. 2924 (énfasis suplido).

[15] Nótese que el único indicio en la *Ley de Expropiación Forzosa* a una incautación física o literal de una propiedad parte de la premisa de que esta haya ocurrido luego de los ocho años de afectación o reserva. A su vez, exige un procedimiento categórico de expropiación o negociación. 32 LPRA sec. 2927 ("En caso de que posteriormente [refiriéndose al período de ocho años] el Estado tenga la necesidad de **tomar** la propiedad para un fin público, el Estado la **adquirirá** mediante negociación o mediante procedimiento de expropiación")(énfasis suplido).

restricciones estará sujeta a un análisis caso a caso. Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency, supra, pág. 332 ("[T]he default rule remains that a fact specific inquiry is required in the regulatory taking context"). Sin embargo, en la medida en que esa restricción sea de tal magnitud que prive al propietario de todo uso productivo, aunque sea temporeramente, podría constituir una incautación compensable. Hampton Development Corp. v. ELA, supra, págs. 895-896, 898-902.[16] En ese sentido, la

---

[16] En Hampton Development Corp. v. ELA, supra, citamos al Tribunal Supremo federal a los efectos de que "[u]na *reglamentación de carácter temporero que efectivamente priva* al dueño de todo uso y disfrute de su propiedad constituye una incautación compensable". Íd., pág. 898 (énfasis en el original). Estas expresiones las hicimos siguiendo lo resuelto en First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304 (1987), donde ese Tribunal concluyó que una vez ocurre una incautación por vía reglamentaria, el hecho de que esta se rescinda posteriormente no releva al gobierno del deber de compensar por el tiempo que duró la incautación. R.D. Rotunda & J.E. Nowak, op. cit., pág. 991. Interpretamos esto como un deber categórico de compensación por cualquier incautación, incluso de carácter temporero. Sin embargo, el Tribunal Supremo federal luego aclaró en Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency, supra, que no toda reglamentación amplia pero temporera constituye una incautación *per se*, sino que debe sujetarse a un análisis específico según los hechos y las circunstancias. Íd., págs. 332, 335 ("Neither *Lucas*, nor *First English*, nor any of our other regulatory takings cases compels us to accept petitioners' categorical submission. In fact, these cases make clear that the categorical rule in *Lucas* was carved out for the 'extraordinary case' in which a regulation permanently deprives property of all value; the default rule remains that, in the regulatory taking context, we require a more fact specific inquiry"; "[W]e are persuaded that the better approach to claims that a regulation has effected a temporary taking requires careful examination and weighing of all the relevant circumstances."). Esta decisión surgió precisamente en el contexto de períodos de moratoria como el dispuesto en nuestra *Ley de Expropiación Forzosa*, mediante los cuales el gobierno restringe el uso productivo que se le puede dar a una propiedad por un tiempo determinado durante el cual delibera la planificación territorial de un área. Véase Íd., pág. 339. Sobre el particular, el Tribunal Supremo de Estados Unidos se rehusó a establecer un período fijo a partir del cual una moratoria o restricción temporera de uso sería declarada inválida. Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency, supra, pág. 342 ("In our view, the duration of the restriction is one of the important factors that a court must consider in the appraisal of a regulatory takings claim, but with respect to that factor as with respect to other factors, the "temptation to adopt what amount to *per se* rules in either direction must be resisted"); véase J.J. Álvarez González, op. cit., págs. 665-666 ("*Tahoe-Sierra* aclaró que no toda privación temporera de todo uso productivo es una

aplicabilidad del período de ocho años dependerá de la validez constitucional de la afectación o reserva en cuestión.

                                    III

En el caso ante nuestra consideración, el foro recurrido determinó que la acción de la peticionaria no estaba madura al momento de presentarse, puesto que no habían transcurrido los ocho años establecidos en la *Ley de Expropiación Forzosa*. 32 LPRA sec. 2926. Tomando en consideración que los hechos de este caso constituyen una clara incautación física de la propiedad de la peticionaria, la posición del Tribunal de Apelaciones no se sostiene a la luz de la propia *Ley de Expropiación Forzosa* y del derecho constitucional aplicable.

Como hemos visto, el reclamo de expropiación a la inversa de la peticionaria se basa en un desalojo físico y permanente de la propiedad, junto a actos de dominio por parte del Municipio de Ponce sobre la propiedad. Entre estos últimos, se destaca la remoción de las puertas y ventanas por parte de personal del Municipio de Ponce; la colocación de un tubo de ocho pulgadas frente a la

---

incautación, especialmente cuando la congelación se debe a la necesidad de estudiar la situación para determinar el tipo de reglamentación abarcadora que se requiere en cierta área"). Sin embargo, valga mencionar que algunos juristas han puesto en entredicho la validez constitucional del período de ocho años en nuestro ordenamiento. Véase P. Muñoz Nazario, ¿Es inconstitucional la Ley de Expropiación a la Inversa?, 48 Rev. Der. PR 23, 31 (2009); J.J. Álvarez González, Derecho Constitucional de Puerto Rico y Relaciones Constitucionales con Estados Unidos, Temis, 2010, pág. 666; L. Villaronga, Derecho Constitucional, 66 Rev. Jur. UPR 391, 397 (1997); J.J. Álvarez González, Derecho Constitucional, 61 Rev. Jur. UPR 637, 751 (1992).

residencia que impide el acceso a la misma; la colocación de un sismógrafo en el patio frontal de la propiedad; las declaraciones oficiales que recomendaron que el de la peticionaria fuera permanente, y los pagos de arrendamiento provistos a la peticionaria.[17]

Según discutiéramos, el período de ocho años de la *Ley de Expropiación Forzosa* está contemplado para instancias en las que el gobierno *afecta* o *reserva* una propiedad para un fin público. Es decir, se trata de una denegatoria del uso privado de la propiedad en tanto se contempla conferirle un uso público. Nuevamente, este período no está contemplado para cobijar al Gobierno por ocho años de una acción de expropiación a la inversa tras su incautación física e indeterminada de una propiedad. Las definiciones de *afectación* y *reserva* establecidas en la ley no tienen ese alcance. 32 LPRA sec. 2924. Véase Aner Investment Corp. v. J.P., 148 DPR 241, 252 (1999) (citando el historial legislativo del período de ocho años a los efectos de que "el único efecto de este [período] es que el Estado no puede reservar o congelar propiedades por un término mayor de ocho años").[18]

Por otro lado, tal y como hemos enfatizado, una incautación física exige una justa compensación por mandato

---

[17] Además de esto, obra en el expediente una recomendación de la División Legal del Municipio de Ponce de que los propietarios desalojados debían dar de baja los mismos del CRIM. Apéndice, pág. 64.

[18] Véanse también las definiciones de *afectación* y *reserva*. Reiteramos que la única alusión en la *Ley de Expropiación Forzosa* a una incautación física se refiere a aquella que ocurra luego de los ocho años de afectación y exige un procedimiento categórico de expropiación o negociación. 32 LPRA sec. 2927

constitucional. La jurisprudencia federal y estatal reconoce que "cuando la intrusión física alcanza la forma extrema de una ocupación física permanente, ocurre una incautación [*taking*]". Loretto v. Teleprompter Manhattan CATV Corp., supra, pág. 426 (traducción nuestra).[19] Si bien existen excepciones limitadas a la procedencia de compensación por incautación física cuando, por ejemplo, la incautación se da en medio de emergencias extremas, consideramos que estas son impertinentes al caso de autos. R.D. Rotunda & J.E. Nowak, op. cit., pág. 1013.[20] Nos explicamos.

Las excepciones en torno a incautaciones de emergencia ("emergency takings")[21] se plantean como defensa de un ente gubernamental que, ante un reclamo de un propietario, niega responsabilidad compensatoria sobre el particular dadas las

---

[19] Como mencionáramos antes, se ha reconocido que incluso una incautación física temporera debe compensarse. Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency, supra, pág. 322 ("Thus, compensation is mandated when a leasehold is taken and the government occupies the property for its own purposes, even though that use is temporary. Similarly, when the government appropriates part of a rooftop in order to provide cable TV access for apartment tenants; or when its planes use private airspace to approach a government airport; it is required to pay for that share no matter how small") (citas omitidas).

[20] De ordinario, estos se caracterizan por una incautación *temporera* o una destrucción *parcial* de bienes inmuebles en contextos de daño inminente y sin visos de permanencia. Así, por ejemplo, el Tribunal Supremo federal ha denegado compensación en los siguientes casos: propiedad destruida (edificio) durante tiempo de guerra para evitar que fuerzas enemigas tomen control de ella; propiedad destruida (edificio) por terceros como represalia por haber cobijado temporeramente a soldados estadounidenses en tiempo de guerra; propiedad destruida (árboles) por el riesgo de infección y contaminación que representaba. R.D. Rotunda & J.E. Nowak, op. cit., págs. 1013-1014.

[21] Véanse B. Angelo Lee, Emergency Takings, 114 Mich. L. Rev. 391 (2015); S.S. Kuo, Disaster Tradeoffs: The Doubtful Case for Public Necessity, 54 B.C. L. Rev. 127 (2013); D.T. Muller, "As Much upon Tradition as upon Principle": A Critique of the Privilege of Necessity Destruction Under the Fifth Amendment, 82 Notre Dame L. Rev. 481 (2006).

circunstancias en las que ocurrió la incautación alegada. El caso ante nosotros es distinguible. Aquí, el Municipio de Ponce actuó a base de una política pública predeterminada según la cual procedía la expropiación de las propiedades y la mitigación de los daños terrenales por motivos de seguridad pública.[22] Es decir, la responsabilidad compensatoria fue autoimpuesta por la propia política pública gubernamental, de manera que no se requiere una justificación constitucional independiente y, en el supuesto de que aplicara, la defensa excepcional de incautación de emergencia no está disponible.

En fin, la controversia restante ante nuestra

consideración es si, en el cumplimiento con esa política pública, el Municipio de Ponce puede beneficiarse del período de ocho años de la *Ley de Expropiación Forzosa*. Respondemos en la negativa puesto que: (1) en virtud de la política pública de expropiación se configuró una

---

[22] Véanse Orden Ejecutiva Núm. 2009-27, Apéndice, págs. 47-49; Orden Ejecutiva Núm. 2008-56, Apéndice, págs. 43-46; Orden Ejecutiva Núm. 2007-43, Apéndice, págs. 39-42; *Certificación de Recomendación de Desalojo de Residencias en Comunidad Reparto Cerca del Cielo*, Apéndice, págs. 118-119; *Comunicado Urgente* (sobre Contribución sobre la Propiedad Inmueble, Apéndice, pág. 64. No nos persuade el argumento del Municipio de Ponce en torno a que la política pública de desalojo y expropiación la estableció el Gobierno central y no el propio Municipio. Este hecho no le releva de responsabilidad pues fue el Municipio quien, en virtud de las respectivas ordenanzas y mandatos administrativos, llevó a cabo los actos de desalojo y mitigación sobre las propiedades. No es necesario que se esté beneficiando de esa gestión ni que haya sido el artífice de la misma para que se configure una incautación de su parte. Si el Municipio tenía alguna contención con la política pública del Gobierno central y los fondos asignados para su consecución debió impugnar su validez, no proceder con las medidas de desalojo permanente, mitigación y adquisición de sobre 19 residencias, para ahora desentenderse de las implicaciones jurídicas de sus actuaciones en cuanto a la propiedad en controversia. Véase Sentencia del TPI, págs. 6 y 9.

incautación física de la propiedad, (2) el período de ocho años de la *Ley de Expropiación Forzosa* no aplica a incautaciones físicas, y (3) por mandato constitucional las incautaciones físicas exigen categóricamente una justa compensación.

Estamos ante un caso en que personal del Municipio de Ponce desalojó a la peticionaria de su propiedad. Luego, el Municipio le proveyó un subsidio de renta y ejerció facultades de dominio sobre su propiedad (a través de la remoción de utilidades de la propiedad y la instalación de artefactos en la propiedad). Todo lo anterior lo hizo en virtud de declaraciones administrativas que recomendaban el desalojo permanente de la propietaria de su residencia. Determinamos que lo anterior configura una incautación física de tal naturaleza que exige categóricamente una justa compensación. Puesto que esta incautación ya había ocurrido cuando la peticionaria presentó su acción, y que el período de ocho años de la *Ley de Expropiación Forzosa* es inaplicable en estos casos, su acción no fue prematura.

IV

Por los fundamentos expuestos, concluimos que erró el Tribunal de Apelaciones al determinar que la acción de la peticionaria era prematura por presentarse antes de que transcurriera el período de ocho años de la *Ley de Expropiación Forzosa*. Ante este cuadro fáctico, el Municipio de Ponce tiene un deber inaplazable de compensar

a la peticionaria el justo valor de su propiedad tal como determinó el foro primario.

Se revoca al Tribunal de Apelaciones y se reinstala la sentencia emitida por el Tribunal de Primera Instancia.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez concurre sin Opinión escrita. El Juez Asociado señor Rivera García disiente con opinión escrita.

Juan Ernesto Dávila Rivera
Secretario del Tribunal Supremo

Frances I. Torres Marrero

     Apelante

     v.                      AC-2016-0106

Hon. María E. Meléndez Altieri, Alcaldesa de Ponce, y Municipio Autónomo de Ponce

     Apelados

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

**Opinión disidente emitida por el Juez Asociado SEÑOR RIVERA GARCÍA**

En San Juan, Puerto Rico, a de 27 de diciembre de 2017.

El asunto que se sometió ante nuestra consideración era uno novel cuya trascendencia era innegable, máxime tras el reciente paso de un fenómeno atmosférico por Puerto Rico. Este caso nos presentó la oportunidad de justipreciar si una acción gubernamental ——desalojar una comunidad que estaba en riesgo a raíz de unos deslices de terreno y ocupar parte de la propiedad de uno de sus residentes para implementar medidas a los fines de mitigar los daños—— conlleva una acción de expropiación forzosa a la inversa en su modalidad de incautación física. En

términos sencillos, dejamos pasar la ocasión de realizar un balance entre el poder de razón de estado

de velar por la seguridad, la salud y el bienestar de la comunidad y la facultad gubernamental de expropiar para así enumerar los requisitos que deben cumplirse para que proceda el pago de la justa compensación en este último escenario.

Debido a que los sucesos fácticos fueron anteriormente consignados en la sentencia mayoritaria, pasemos a exponer el marco jurídico para dilucidar este asunto.

## I

Nuestro ordenamiento reconoce el derecho a la propiedad como un derecho fundamental. No obstante, tal derecho no es absoluto toda vez que se puede limitar en beneficio del bienestar general.[23] El Estado tiene la facultad de restringir el derecho de propiedad de un individuo mediante su poder de expropiación, es decir, tiene el poder desposeer a un propietario de sus cosas.[24] Empero, nuestra Constitución condiciona el ejercicio de esta facultad a que el bien sea destinado a un fin público y que se pague al propietario la justa compensación.[25] Esto, pues la Sec. 9 de su Art. I erige que "[n]o se tomará o perjudicará la propiedad privada para uso público a no ser

---

[23] Culebra Enterprise Corp. v. E.L.A., 127 DPR 943, 952 (1991).
[24] Íd., pág. 952.
[25] Íd.

mediante el pago de una justa compensación y de acuerdo con la forma provista por ley".[26]

Usualmente, cuando el Estado ejerce su poder de dominio eminente lo hace con la presentación de una acción de expropiación forzosa en virtud de la Ley de Expropiación Forzosa, Ley de 12 de marzo de 1903, según enmendada, 32 LPRA sec. 2901 *et seq.*, y la Regla 58 de Procedimiento Civil, 32 LPRA Ap. V. [27] Empero, excepcionalmente, hemos instituido que "el Estado puede ocupar o incautar un derecho real sin haber iniciado el procedimiento judicial de expropiación forzosa y sin haber consignado el pago de la justa compensación".[28] En cuyo caso, aquel individuo que se ve afectado por la acción gubernamental puede incoar una acción de expropiación forzosa a la inversa.[29]

Esta acción de expropiación a la inversa se puede fundamentar "en la incautación física o en perjuicios sufridos por acción o reglamentación del Estado". [30] A través de este pleito, "el demandante solicita o justa compensación o que cesen las actuaciones del Estado o que se invalide la reglamentación que causa daños a la propiedad". [31] Una vez se insta esta acción, "el propietario deberá demonstrar que el Estado ha ocupado

---

[26] Art. II, Sec. 9, Const. PR, LPRA, Tomo 1.
[27] Amador Roberts ets als. v. ELA, 191 DPR 268, 278 (2014).
[28] Íd., pág. 279.
[29] Íd.
[30] R. Serrano Geyls, Derecho Constitucional de Estados Unidos y Puerto Rico, Vol. II, 1988, pág. 888.
[31] R. Serrano Geyls, *op. cit.*, pág. 888.

incautado su propiedad y litigará 'la existencia del uso público y la justa compensación en la misma forma y manera que estas cuestiones se dilucidan en la acción de expropiación forzosa'".[32]

Sin embargo, distinto a la acción de expropiación forzosa que inicia el Estado, la demanda de expropiación a la inversa no convierte a éste en un comprador involuntario, ni tampoco le inviste el título absoluto del dominio de la propiedad.[33] Más bien lo que desata es que, una vez el demandante acredite que su propiedad fue incautada, el Estado venga obligado a compensarle y colocarlo en una situación económica equivalente a la que se encontraba con anterioridad a la incautación de su propiedad.[34] Iniciado el pleito, "el Estado puede optar por expropiar la propiedad o liberarla, e indemnizar al propietario por el tiempo en que la propiedad permaneció afectada".[35]

Durante el transcurso de los años este Tribunal se ha visto precisado en abordar el tema de la expropiación forzosa a la inversa. En Arenas Procesadas v. E.L.A., 132 DPR 593 (1993), admitimos que no existía una fórmula que demarcara el poder de razón del estado y su facultad de expropiar. Por ese motivo, en aquella ocasión, nos vimos forzados a establecer los parámetros que constituían la

---

[32] Amador Roberts ets als. v. ELA, *supra*, pág. 280.
[33] Íd.
[34] Íd., pág. 281.
[35] Íd.

acción de expropiación cuando el Estado afectaba una propiedad y privaba a su propietario de todo uso productivo al promulgar un reglamento.

Otro punto que ha sido objeto de interpretación es el asunto de la incautación. Ello, en consideración a que, en estos casos, la obligación del Estado de pagar una compensación justa surge cuando incauta el bien.[36] En lo atinente a la incautación física, en <u>Loretto v. Teleprompter Manhattan Catv Corp.</u>, 458 U.S. 419 (1982), el Máximo Foro Judicial Federal examinó varios de sus pronunciamientos respecto a este asunto y dispuso que

> when the 'character of the governmental action' Penn Central, 438 U.S., at 124, is a **permanent physical occupation of property**, our cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner. (Énfasis suplido).

Es decir, el Máximo Foro Judicial Federal estableció que cuando el Gobierno ejecuta una incautación física y la misma es **<u>permanente</u>** ello es suficiente para que éste tenga la obligación de satisfacer la justa compensación sin importar tamaño del espacio que ocupe. Por otra parte, en <u>National Bd.Of Young Men's Christian Assoc.v. United States</u>, 395 U.S. 85 (1969), el Tribunal Supremo de Estados Unidos se enfrentó a la interrogante de si la

---

[36] Íd., pág. 277.

ocupación por parte del Estado de un edificio con el propósito de

contrarrestar una protesta violenta era una acción que daba lugar al pago de la justa compensación. Al resolver ese punto, concluyó lo siguiente:

> There are, however, unusual circumstances in which governmental occupation does not deprive owner of any use of his property. For example, the entry by firemen upon burning premises cannot be said to deprive the private owners of any use of the premises.
>
> . . . . . . . .
>
> Certainly, the *Just Compensation Clause* could not successfully be invoked in a situation where a rock hurled at a policeman walking his beat happens to damage private property. Similarly, in the instant case, **we conclude that the temporary, unplanned occupation of petitioner buildings in the course of battle does not constitute direct and substantial enough government involvement to compensation under the Fifth Amendment.** (Énfasis suplido).

En cuanto a qué se considera una incautación, en <u>E.L.A. v. Northwestern Construction Inc.</u>, 103 DPR 377 (1975) atendimos este punto en contexto de una acción expropiación a la inversa por incautación física. En esa ocasión, definimos el término **incautación** como "<u>**cualquier privación o interferencia sustancial en el dominio o el disfrute de una cosa**</u>".[37] Además, al citar a Nichols expusimos que la incautación era "**[c]ualquier interferencia sustancial con la propiedad que destruya o disminuya su valor, o por la cual el derecho del dueño a**

---

[37] <u>E.L.A. v. Northwestern Construction Inc.</u>, 103 DPR 377, 384 (1975). (Énfasis suplido).

**usarla o disfrutarla sea sustancialmente menoscabado o destruido".[38]**

En vista de lo que precede, es posible inferir que no toda ocupación física de un bien por parte del Estado es una incautación que permite la presentación de una acción de expropiación a la inversa. El proceder que necesariamente activa la obligación del Estado de pagar una justa compensación es aquella incautación física y permanente que priva o interfiere sustancialmente con el derecho de domino y de uso y disfrute de un propietario.

## II

Ciertamente, conforme al derecho esbozado, cuando el Estado incauta físicamente la propiedad de un individuo este puede incoar una acción de expropiación a la inversa. Para que esta acción proceda es menester que la persona evidencie que el Estado incautó su propiedad. Esto es, deberá probar que se le privó o interfirió sustancialmente con su derecho dominical o con el derecho a disfrutar de su bien.

Al ponderar si en este caso se configuró una incautación, debemos considerar que la mayoría de esta Curia reconoce que el mismo se originó cuando se deslizaron ciertos terrenos de la Comunidad Reparto Cerca del Cielo del Barrio Canas de Ponce (Comunidad) y los residentes de estas propiedades. A

---

[38] Íd.

causa de esos deslizamientos, se agrietaron terrenos, caminos y residencias. Lo anterior, desenlazó un **riesgo** para la Comunidad al punto de que el Gobierno de Puerto Rico y el Municipio Autónomo de Ponce **se vieron precisados a tomar unas series de medidas para contener el peligro**.

En ese sentido, la Oficina Estatal para el Manejo de Emergencia emitió una certificación mediante la cual declaró en **estado de ruina** varias propiedades de la Comunidad y recomendó su desalojo permanente ya que, potencialmente, constituían un peligro para la vida. Ello, **como consecuencia de la inestabilidad del terreno** y **daños a las estructuras**. Entre esos inmuebles que fueron declarados en estado de ruina se encontraba la propiedad de la Sra. Frances I. Torres Marrero (la peticionaria). Consecuentemente, el 7 de noviembre de 2008 el Municipio de Ponce desalojó a la peticionaria de su propiedad.

De lo que precede podemos colegir que fueron los eventos naturales los que provocaron que varios inmuebles, incluyendo la residencia de la peticionaria, se desplazaran y quedaran enmarcadas en una zona declarada como "potencial peligro a la vida debido a la inestabilidad del terreno y daños a las estructuras". Es decir, el desalojo de la peticionaria de su propiedad que llevó a cabo el Municipio de Ponce se fundamentó en factores geológicos y estructurales. Fueron tales eventos

los que privaron a la peticionaria del uso y disfrute de su bien.

Asimismo, debemos de tomar en cuenta que el Tribunal de Primera Instancia realizó las determinaciones de hechos que siguen:

> (7) la propiedad de la demandante presenta problemas de accesibilidad debido a que un tubo de ocho pulgadas de diámetro fue colocado en la acera como parte de las obras de mitigación del área, el cual obstruye el acceso a pie de la propiedad e impide el acceso vehicular a la misma.
>
> (8) en el patio frontal de la propiedad ubica un sismógrafo para monitorear los desplazamientos del área.
>
> (9) en un momento dado personal del Municipio de Ponce removió puertas y ventanas de la propiedad.

En cuanto a estos actos, el Municipio de Ponce aseveró que fueron

> una acción conjunta del Estado y del Municipio **dirigida a evitar riesgos**, a los titulares frente a la situación de peligrosidad surgida en ese lugar a causa de los deslizamientos. En otras palabras, **se trató de una medida de protección y mantenimiento de la seguridad pública**. No es razonable adjudicar al Municipio con tal curso de acción intención actual o futura de apropiarse de la propiedad con alguna finalidad pública. (Énfasis en el original).[39]

A la luz de lo anterior, al examinar si hubo un acto de incautación que activara la obligación del Estado de pagar una justa compensación, debimos considerar que no fue la acción gubernamental la que privó o interfirió con

---

[39] Véase, Alegato de la Parte Recurrida, pág. 14.

el dominio y el derecho de disfrute de la peticionaria, sino los deslizamientos que colocaron su propiedad en peligro. Si bien el Municipio de Ponce ocupó la acera del inmueble y colocó en el patio frontal un sismómetro para monitorear los desplazamientos, ello no puede ser constitutivo de una incautación permanente. Tales actos fueron dirigidos a los fines de mitigar y prevenir mayores desplazamientos y así proteger la vida de los residentes, incluyendo a la peticionaria. Fueron esos acontecimientos lo que ocasionaron que el Municipio desalojara y ocupara los terrenos para mitigar los deslices y así evitar mayores riesgos. Ello por si solo no puede considerarse como una incautación que permita la presentación una acción de expropiación forzosa a la inversa.

En fin, en este caso al igual que en The Richards Group v. Junta de Planificación, 108 DPR 23, 39 (1978), debimos sopesar los valores que se encuentran presentes. Esta determinación se realizaría caso a caso. Así, debimos "[i]dentificar abiertamente esos valores y las realidades en que se basan, precisar su jerarquía, situación a situación, para lograr un equilibrio razonable para el tiempo que vivimos entre los actos gubernamentales que exigen compensación […] y los que no la exigen." Estoy convencido que la situación del caso de auto y las razones para el desalojo de la peticionaria no daba lugar a una

acción   de   expropiación   a   la   inversa.   Por   estos
fundamentos, respetuosamente, disiento.


                                        Edgardo Rivera García
                                            Juez Asociado